# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 07-1430

ANGELA GOUTRO

VERSUS

F.G. SULLIVAN, JR., CONTRACTOR, L.L.C., ET AL.

**********
APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, DOCKET NO. 03-C-4683
HONORABLE JAMES P. DOHERTY, PRESIDING
**********

## SYLVIA R. COOKS
## JUDGE

**********

Court composed of Sylvia R. Cooks, Marc T. Amy and J. David Painter, Judges.

**AFFIRMED IN PART, AMENDED IN PART, REVERSED IN PART AND RENDERED.**

Raleigh Newman
Donald W. McKnight
1830 Hodges Street
Lake Charles, LA 70601
(337) 439-5788
COUNSEL FOR PLAINTIFF/APPELLANT:
    Angela Goutro

Mark R. Pharr, III
Mark Garber
Galloway, Johnson, Tompkins, Burr & Smith, PLC
4021 Ambassador Caffery Parkway
Building A, Suite 175
Lafayette, LA 70503
(337) 735-1760
COUNSEL FOR DEFENDANTS-APPELLEES:
    F.G. Sullivan, Jr. Contractor, L.L.C. and State of Louisiana, Through DOTD

**COOKS, Judge.**

On the morning of October 29, 2002, Angela Goutro, was driving from her home in Merriville, Louisiana, to attend classes at LSU-Eunice. While traveling in a westerly direction on U.S. Highway 190, she entered a construction zone. As she traveled in the construction zone, she came to what is called the "Two O'Clock Bridge," which is a flat bridge, approximately one-half mile long.

As she crossed the bridge, Ms. Goutro's vehicle ran across a number of potholes, in response to which she stated she reduced her speed. She also switched lanes (Hwy. 190 is a four-lane road at this point), in the belief that the potholes in the other lane were not as severe. While switching lanes, she hit a large pothole, causing her to lose control of her vehicle. According to Ms. Goutro, due to other potholes that were present she was unable to regain control of her vehicle and struck the left guard rail. This caused her vehicle to career over and strike the right railing. Ms. Goutro was then able to gain control of her vehicle and drive it safely to the shoulder area.

As a result of the accident, Ms. Goutro began experiencing neck and back pain. That night she noticed swelling in her neck and her right foot was tingling. She went the following morning to the emergency room at Opelousas General Hospital for treatment. When her symptoms continued to worsen, Ms. Goutro was referred to Dr. John Cobb, an orthopedist. Ms. Goutro began to have episodes where her leg would give way; and, on one occasion, she severely struck her knee on the floor during a fall. Eventually she had arthoscopic surgery on her knee, where a torn medial meniscus was repaired. Dr. Elemer Raffai, who performed the knee surgery, anticipated that another knee surgery would likely be required. There was also medical testimony that Ms. Goutro's back and knee problems became chronic and

would be permanent in nature. Dr. Raffai believed the knee problems were secondary to, and caused by the back injury she sustained in the accident. Dr. Raffai noted Ms. Goutro continues to suffer from reoccurring back spasms, which causes her legs to give way. She also has physical limitations due to her knee injury.

Ms. Goutro filed a personal injury suit against the State of Louisiana, through the Department of Transportation and Development (DOTD) and F.G. Sullivan, Jr. Contractor, L.L.C. In investigating the accident, Ms. Goutro discovered the resurfacing of Two O'Clock Bridge was part of the construction project in that area of Hwy. 190 undertaken by DOTD. This work had been contracted out to F.G. Sullivan. As part of the resurfacing, F.G. Sullivan had milled off the top two inches of the bridge.

In the early morning hours of October 28, 2002, (the day before Ms. Goutro's accident), there was rain in the area causing significant potholes to form on the bridge. On the morning of the 28th, an accident occurred wherein Mrs. Bobbie Williams lost control of and wrecked her vehicle due to the potholes. After the accident, F.G. Sullivan and DOTD placed cold mix in the potholes that had formed. Ms. Goutro argued at trial that both F.G. Sullivan and DOTD were aware that more rain was forecast in the immediate future, and should have foreseen that more potholes would develop as a result and present a dangerous condition for the traveling public. More rain did occur in the early morning hours of October 29, 2002, and Ms. Goutro acknowledged that the volume of rainfall at the time of the accident was "considerable." Ms. Goutro stated she started hitting potholes as soon as she began crossing the bridge. She further testified she was driving approximately 50 miles per hour when she reached the bridge. The reduced speed limit in the construction area was 45 miles per hour. She said as she began hitting the potholes, she lessened her

speed. The investigating officer stated that Ms. Goutro informed him she was going 50 miles per hour immediately prior to the accident.

Ms. Goutro presented testimony that she was not the only driver to lose control of a vehicle that morning. There were at least three other minor accidents that same morning within a short period of time, where drivers lost control of their vehicles.

When DOTD and F.G. Sullivan arrived at the scene after being alerted of the accidents by the State Police, repair work was immediately begun. To repair the potholes, one lane of traffic was closed at a time and the speed limit was reduced to 30 miles per hour. After repairs were made, both lanes of traffic were reopened.

At trial, Ms. Goutro's expert testified it was the potholes alone that caused the accident to occur. Defendant's expert maintained it was a combination of factors, including the potholes, the heavy rain, the speed at which Ms. Goutro operated her vehicle, the sudden change of lanes, and the subpar condition of Ms. Goutro's brakes and tires on her vehicle.

The jury returned a verdict finding defendants, DOTD and F.G. Sullivan, fifty percent at fault and Ms. Goutro fifty percent at fault. The following damages were awarded:

| | |
|---|---|
| Past Medical Expenses | $ 20,000.00 |
| Future Medical and Attendant Expenses | $ 30,000.00 |
| Loss of Past Earnings | $ 45,000.00 |
| Loss of Future Earning Capacity | $250,000.00 |
| Past, Present and Future Mental and Physical Pain and Suffering and Disability | $ 25,000.00 |
| Loss of Enjoyment and Quality of Life | $ 0.00 |

A judgment was signed in accordance with the jury's verdict. Ms. Goutro lodged this

appeal, asserting the following assignments of error:

1. The jury erred in finding Ms. Goutro fifty percent at fault;

2. The jury erred in not awarding the full amount of past medical expenses;

3. The jury erred in awarding insufficient amounts for past loss of earnings and loss of future earning capacity;

4. The jury erred by failing to award a sufficient amount for pain, suffering, disability, and loss of enjoyment of life.

## ANALYSIS

### I. *Apportionment of Fault.*

In *Layssard v. State, Dep't of Public Safety and Corrections*, 07-78, p. 3 (La.App. 3 Cir. 8/8/07), 963 So.2d 1053, 1057, *writ denied*, 07-1821 (La. 11/9/07), 967 So.2d 511, this court set forth the standard of review for a trier of fact's apportionment of fault:

> The Louisiana Supreme Court, in *Duncan v. Kansas City Southern Railway Co.*, 00-66, pp. 10-11 (La.10/30/00), 773 So.2d 670, 680-81, set forth the standard for reviewing comparative fault determinations as follows:
>
> > This Court has previously addressed the allocation of fault and the standard of review to be applied by appellate courts reviewing such determinations. Finding the same considerations applicable to the fault allocation process as are applied in quantum assessments, we concluded "the trier of fact is owed some deference in allocating fault" since the finding of percentages of fault is also a factual determination. *Clement v. Frey*, 95-1119 (La.1/16/96), 666 So.2d 607, 609, 610. As with other factual determinations, the trier of fact is vested with much discretion in its allocation of fault. *Id.*
>
> Therefore, a trier of fact's allocation of fault is subject to the manifestly erroneous or clearly wrong standard of review. A trial judge's findings of fact will not be disturbed unless they are manifestly erroneous or clearly wrong. *Stobart v. State, through Dep't of Transp. & Dev.*, 617 So.2d 880 (La.1993). "Absent 'manifest error' or unless it is 'clearly wrong,' the jury or trial court's findings of fact may not be disturbed on appeal." *Sistler v. Liberty Mut. Ins. Co.*, 558 So.2d 1106,

1111 (La.1990). "If the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 1112.

State Trooper Frank Garcia, was the investigating officer at the scene.[1] He testified when he arrived he observed several vehicles off to the side of the road near the end of the bridge. He also stated that the bridge, and in particular one of the two lanes, was "covered with potholes." After speaking with the drivers of the other vehicles that ran off the road, he stated those drivers told him they lost control of their vehicles due to the potholes. Trooper Garcia found the posted speed limit was 45 miles per hour and all the signs and signals required for a construction zone were present. Trooper Garcia stated no traffic citation was issued to Ms. Goutro. At one point in his deposition testimony Trooper Garcia specifically stated he did not believe Ms. Goutro was traveling too fast for the conditions. However, later in his testimony he stated he believed "probably around 30 miles an hour or slower" would have been a safe speed to travel that portion of roadway. Trooper Garcia testified he asked Ms. Goutro how fast she was going "before [she] wrecked," and she told him fifty miles per hour. Trooper Garcia was adamant that he specifically asked Ms. Goutro how fast she was going at the time she lost control of the vehicle.

Ms. Goutro presented the testimony of Duaine Evans as an expert in traffic engineering and accident reconstruction. Mr. Evans concluded the sole fault for the accident rested with DOTD and F.G. Sullivan. Mr. Evans testified that since DOTD and F.G. Sullivan had knowledge that potholes had formed the previous day from rain and that rain was forecast for the next day, they should have anticipated more potholes forming and taken steps to prevent that from happening. He testified the

---

[1] Trooper Garcia was unable to testify at trial due to a gunshot injury he sustained. His previous deposition testimony and his accident report were submitted in lieu of his live testimony.

speed limit should have been lowered from the posted 45 miles per hour, further signage warning of rough roads ahead should have been added, and one lane should have been closed down to prevent lane changes and excessive speed. Although Mr. Evans acknowledged DOTD brought in 30 tons of cold mix to repair potholes the day before the accident, he questioned the effectiveness of cold mix when conditions were wet. However, the testimony of Mr. Evans indicates he found that cold mix works well even in wet conditions provided that asphalt emulsion is used along with the cold mix. Mr. Evans stated as follows:

> Q. Did they make a material that you're familiar with that you can use to spray or put on the surface to be patched which will make the patching material adhere to it better, stick better?
>
> A. Yes, its an asphalt emulsion. They commonly put it down when they are overlaying a concrete road. They spray it with this asphalt emulsion first and the asphalt will adhere to the concrete even when the asphalt - - even when the concrete is damp or fairly wet, it will work to some extent.
>
> Q. It works real good even when the concrete is damp?
>
> A. Yes.

Although Evans criticized Defendants for a supposed failure to use asphalt emulsion, the record indicated asphalt emulsion was used in concert with the cold mix by F.G. Sullivan. The jury was presented with a certificate from the State certifying that asphalt emulsion was stored on site.

Luther Cox testified for the defendants as an expert in accident reconstruction. He noted the speed limit in the construction zone had been reduced from 65 to 45 miles per hour, and the road was properly signed and signaled. Mr. Cox testified according to the measurements taken by Trooper Garcia, Ms. Goutro traveled nearly half a mile on the potholed bridge before losing control of her vehicle. Mr. Cox believed Ms. Goutro was traveling at an excess speed for the conditions present,

which included not only the potholes, but the heavy rain and resultant water on the roadway. He concluded that the most likely cause of the accident was hydroplaning on the wet, rough roadway.

James Barnes, a superintendent for F.G. Sullivan, testified the Two O'Clock Bridge had just been milled for purposes of laying a new layer of asphalt. He acknowledged at this stage of construction it was common to have potholes appear, particularly during periods of rain. He stated it was a common and well accepted practice to use cold mix to repair potholes. Her noted that hot mix is an even more effective material for the repair of potholes, however, hot mix cannot be stored and must be immediately used when made. He also noted the hot mix plant does not run when there is inclement weather. He testified on October 28, 2002, F.G. Sullivan used cold mix to repair a number of potholes on the Two O'Clock Bridge. He stated that cold mix had been used previously to repair potholes on the bridge, and the potholes did not reappear the next day. Hot mix was unavailable on October 28th because of the inclement weather. Mr. Barnes stated that the water was swept out of the potholes and then a "tack" or asphalt emulsion solution called "SS1" was used to help the cold mix adhere to the road surface.

Val Noel, who was a DOTD inspector, testified he had inspected the area in question on October 25, 2002, and found all signs and barricades were in the proper place and functioning correctly. He also found the road was in good condition. After the accident involving Bobbie Williams on October 28th, Mr. Noel testified DOTD and F.G. Sullivan determined potholes had developed on the west side of the bridge and began patching operations. One lane of traffic at a time was closed and cold mix was used to repair the potholes. Mr. Noel testified both lanes were completely repaired by the end of the day and it was determined by both F.G. Sullivan and

DOTD that the bridge was in a safe condition. No witness disputed that the potholes on the bridge present on October 28th were not repaired and that the conditions present on the morning of October 29th did not arise overnight.

Mr. Noel stated that he received notification early in the morning hours of October 29th that a problem had developed overnight. He stated DOTD and Sullivan immediately came to the scene to evaluate the situation and conduct any necessary repairs. Upon arriving at the scene, Mr. Noel noted that all signs were in place and functioning properly. A road crew was immediately notified to prepare to begin putting out signs to close one lane of the bridge so repairs could begin.

After reviewing the testimony, we find a reasonable basis in the record for the jury's assessment of fault against Ms. Goutro. Although she testified she slowed her speed prior to losing control of her vehicle, Trooper Garcia stated when he asked Ms. Goutro how fast she was going "before [she] wrecked," she told him 50 miles per hour, which was in excess of the posted speed limit. The jury apparently chose to not believe Ms. Goutro's testimony that she slowed down as soon as she encountered rough road. Further, by all accounts, including Ms. Goutro's, the rainfall at the time of the accident was heavy, yet Ms. Goutro was still traveling in excess of the posted speed limit despite the heavy rain and signs indicating she was entering a construction zone.

The trier of fact is vested with much discretion in its allocation of fault. *Clement*, 666 So.2d 607. In light of the evidence presented to the jury we cannot say the jury's findings regarding Ms. Goutro's fault were unreasonable, let alone clearly wrong or manifestly erroneous. Consequently, we must affirm the jury's finding, even if convinced that if we had been sitting as trier of fact, we would have weighed the evidence differently. *Stobart*, 617 So.2d 880. Accordingly, this court declines

to disturb the jury's finding that Ms. Goutro was 50% at fault for the subject accident.

## II.    *Quantum.*

The standard for an appellate review of damages was established in *Reck v. Stevens*, 373 So.2d 498 (La.1979) and confirmed in *Youn v. Maritime Overseas, Corp.*, 623 So.2d 1257 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994). Those cases instruct that we cannot disturb a trial court's award of damages unless we find that the award constitutes an abuse of the trial court's discretion.

## A.    Award of Past Medical Expenses.

Ms. Goutro contends the jury's award of $20,000.00 in past medical expenses was an abuse of the jury's discretion. She argues the record fully supports an award of her full past medical expenses of $63,315.64. We agree.

The record established that Ms. Goutro had been diagnosed with juvenile degenerative disc disease (JDD) when she was thirteen years old. After a minor car accident in April of 2000, Ms. Goutro was treated at the emergency room for complaints of back pain and was diagnosed with a soft tissue strain. There were no further treatments for any back pain after that visit until the accident in question.

Although her JDD may have made Ms. Goutro more susceptible to a back injury, the record does not give any indication that she was suffering from back problems prior to the accident. A defendant's liability for damages is not mitigated by the fact that a plaintiff's pre-existing physical infirmity was responsible in part for the consequences of the injury. A defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. *Perniciaro v. Brinch*, 384 So.2d 392 (La.1980).

Both Dr. Cobb and Dr. Raffai testified that Ms. Goutro's neck complaints, back complaints and leg weakness, and the resulting knee injury were causally related to

the accident. As counsel for Ms. Goutro notes, the jury awarded $30,000.00 for future medical expenses. The only evidence in the record as to any future medical expenses was Dr. Raffai's belief that another knee surgery was likely. Therefore, it appears that the jury accepted both Dr. Cobb and Dr. Raffai's testimony that the knee injury was related to the accident. Thus, we can find no basis for the jury's failure to award the full past medical expenses established in the record. When a plaintiff alleges that medical expenses were incurred "and that allegation is supported by a bill, unless there is sufficient contradictory evidence or reasonable suspicion that the bill is unrelated to the accident, it is sufficient to support the inclusion of that item in the judgment." *Este' v. State Farm Insurance Co.*, 96-99, p. 11 (La.App. 3 Cir. 7/10/96), 676 So.2d 850, 857. A factfinder errs if it fails to award the full amount of medical expenses incurred as a result of the accident and proven by a preponderance of the evidence. *Revel v. Snow*, 95-462 (La.App. 3 Cir. 11/2/95), 664 So.2d 655, *writ denied*, 95-2820 (La. 2/2/96), 666 So.2d 1084. Therefore, we amend the jury's award of past medical expenses and render an award of $63,315.64, commensurate with those expenses established in the record.

**B.   Awards for Loss of Past Earnings and Future Earning Capacity.**

The jury awarded Ms. Goutro $45,000.00 in loss of past earnings and $250,000.00 for loss of future earning capacity. She contends both these awards are insufficient. Defendants contend in their brief that the $250,000.00 award for loss of future earning capacity was excessive, and request that we lower that award. However, Defendants did not file a motion for appeal or file an answer to Ms. Goutro's appeal; therefore, that argument is not properly before this court on appeal. See La.Code Civ.P. art. 2133.

As to loss of future earning capacity, Ms. Goutro contends the jury should have

awarded her in excess of $1,100,000.00. We disagree. Ms. Goutro contended she was going to school to become a teacher and would have pursued that career had she not been injured. However, the jury was presented evidence that since the accident, Ms. Goutro attended college full time and completed her student teaching in 2004. Ms. Goutro also held certifications as a Phlebotomist, EKG technician and transcriptionist. This presented the jury with a reasonable basis to believe Ms. Goutro could eventually work as a teacher or in another occupation after completing therapy. Thus, we find no merit in the argument that the jury's award of $250,000.00 in loss of future earning capacity was an abuse of its vast discretion.

Ms. Goutro also argues the jury's award of $45,000.00 for past earnings was abusively low and asks this court to raise that award to $125,767.00, which was the amount set forth by Dr. Charles Bettinger, her economist. Dr. Bettinger based this figure on her working as a full-time teacher immediately upon graduation up until the date of trial. Dr. Bettinger's testimony was unrefuted.

After a review of the record, we are unable to find any rationale basis for the jury's award of only $45,000.00 in past lost earnings. Ms. Goutro had not been released to work, and the medical testimony of Dr. Cobb and Dr. Raffai was that she was physically unable to work. Defendants argue the jury was presented with some testimony which indicated Ms. Goutro had other interests which might have limited her desire to work in any capacity. They point to Ms. Goutro's testimony that she moved to Texas with her husband so he could pursue his employment, and that the couple also adopted a child in 2006 whom Ms. Goutro stayed at home to care for. However, there was never any testimony in the record that Ms. Goutro was able to physically work during this time period. During this entire period she was still on "no-work" status under Dr. Raffai. Defendant also argues Ms. Goutro did not accept

-11-

full vocational services from Mr. Glen Hebert, who was Ms. Goutro's vocational expert. However, Mr. Hebert's testimony merely established that Ms. Goutro did not seek Mr. Hebert's assistance in locating a job during that time because she had not been released to work by Dr. Raffai. If the jury decreased its award based on any of these factors, it abused its discretion. A claim for past wage loss is not one based on conjecture or speculation and, considering the evidence presented, we find the jury was clearly wrong in awarding past lost wages in the amount of $45,000.00. Therefore, we increase Ms. Goutro's award for past lost wages to $125,767.00.

**C.    Awards for Pain, Suffering, Disability and Loss of Enjoyment of Life.**

The jury awarded Ms. Goutro $25,000.00 in general damages for pain, suffering and disability. It did not award anything for loss of enjoyment of life. Ms. Goutro contends both of these awards were an abuse of the jury's discretion.

Ms. Goutro contends that the general damage award of $25,000.00 is too low given the fact that Ms. Goutro sustained serious and chronic injuries due to her back and knee. She underwent a surgical procedure on her knee as a result of the injuries caused in the accident. Dr. Raffai testified the pain in her back and knees was chronic and would be permanent in nature. Dr. Raffai also testified Ms. Goutro continues to suffer from reoccurring back spasms, which causes her legs to give way. She also has physical limitations due to her knee injury, and it was his opinion she would have to undergo a future surgery. Ms. Goutro's documented past medical expenses were in excess of $60,000.00, and the jury found she was entitled to $30,000.00 in future medical expenses. The jury also awarded $250,000.00 in lost future earning capacity. Considering the injuries suffered by Ms. Goutro and the jury's other awards, we find that the award of $25,000.00 in general damages in this case is woefully inadequate and is not supported by the record. Considering the totality of the facts in this case,

particularly Ms. Goutro's endurance of a surgical procedure, the lowest award that we consider reasonable under the circumstances is $150,000.00. *See Coco v. Winston Indus., Inc.*, 341 So.2d 332 (La.1976).

Ms. Goutro also argues the jury erred in not rendering an award for loss of enjoyment of life. We agree. The courts have held that a separate award for loss of enjoyment of life is warranted and is not duplicative of the award for pain and suffering, if the damages resulting from loss of enjoyment of life are sufficiently proven. *McGee v. A C And S, Inc.*, 05-1036 (La. 7/10/06), 933 So.2d 770; *Basco v. Liberty Mut. Ins. Co.*, 05-0143 (La.App. 3 Cir. 8/17/05), 909 So.2d 660. The jury's decision to not make an award for loss of enjoyment of life cannot be reconciled with its decision to award $30,000.00 for future medical expenses and $250,000.00 for loss of future earning capacity. The medical testimony of Dr. Raffai indicated Ms. Goutro would have to endure chronic pain in her knees and back of a permanent nature. She is a young woman who has had to compensate and change her lifestyle drastically. The injury has clearly interfered with her life, and she has undergone one knee surgery and it is anticipated she will require another. Considering the particular facts and circumstances of this case, we find the appropriate award for Ms. Goutro's loss of enjoyment of life should have been $50,000.00, the lowest amount reasonably within the jury's discretion and consistent with the special damages awards.

## DECREE

For the reasons assigned, we affirm the judgment as to its apportionment of fault and the awards of future medical expenses and loss of future earning capacity. However, we amend the judgment to increase the award for past medical expenses from $20,000.00 to $63,315.64. We also amend the judgment to increase the award for loss of past earnings from $45,000.00 to $125,767.00. The award for pain,

suffering and disability is amended to increase that amount from $25,000.00 to $150,000.00. We reverse the trial court judgment insofar as it failed to award any amount for loss of enjoyment of life, and award $50,000.00. All costs of this appeal are assessed to Defendants, DOTD and F.G. Sullivan.

**AFFIRMED IN PART, AMENDED IN PART, REVERSED IN PART AND RENDERED.**