WICKER, J.
In this appeal, the parties seek review of a judgment rendered following a bench trial for damages sustained from an April 18, 2015 motor vehicle accident. Both parties have appealed, challenging the amounts awarded by the trial judge and raising additional specific assignments of error addressed below. For the following reasons, we affirm.
FACTUAL AND PROCEDURAL BACKGROUND
This litigation arises out of an April 18, 2015 motor vehicle accident on the Crescent City Connection bridge in which an ambulance owned by defendant Jefferson Parish Hospital Service District No. 1 d/b/a West Jefferson Medical Center (hereinafter WJMC) and driven by WJMC employee Jeremy Braun rear-ended a pick-up truck stopped in traffic on the bridge driven by plaintiff, Gerard Latulippe (hereinafter "Daniel"), with his brother Casey Latulippe, as a passenger. The evidence reflects that the ambulance *824 driver, Mr. Braun, did not attempt to avoid the collision, as he did not want to slam on the brakes and cause injury to the patient and EMT in the back of the ambulance.
On November 25, 2015, Daniel and Casey, as well as their spouses, Tamara and Hannah Latulippe, filed suit against WJMC and its driver[1] , wherein Daniel and Casey alleged that they sustained serious physical injuries from the accident and Tamara and Hannah asserted loss of consortium claims arising from their spouses' injuries.[2] Following discovery, the matter proceeded to a bench trial before the Honorable Scott Schlegel on October 23, 2017. WJMC stipulated to the negligence of its driver, and the matter proceeded to trial only on the issues of causation and damages. The following testimony and evidence was presented at trial:
Daniel and Tamara Latulippe
At the time of the accident, Daniel worked for Beverly Construction as a foreman and was commuting with his brother from work to their homes in Slidell. Daniel testified that he was stopped on the Crescent City Connection Bridge when he felt like he was "hit by a train." He recalled that everything in the back seat jolted to the front seat and the CD changer in the car came out of place. He testified that the ambulance driver, Mr. Braun, apologized to him after the accident and explained that he did not want to apply his brakes to avoid the collision because his EMT co-worker and a patient were in the back of the ambulance. Daniel testified that Mr. Braun essentially used his truck as a "bumper system" to reduce the risk of the patient or other EMT being injured.
Immediately following the accident, Daniel sought treatment from Slidell Memorial Hospital's emergency department. The emergency department records reflect that Daniel appeared "uncomfortable" upon arrival. After examination and normal lumbar and cervical X-rays and CT scan results, Daniel was diagnosed with a cervical strain and a myofascial lumbar strain, prescribed pain medications, and referred to a primary care physician. Daniel testified that he was in excruciating pain and "on fire" for five days, requiring help from his wife to get in and out of bed and to move around the house.
Upon referral from his attorney, Daniel treated briefly with New Orleans East Medical Rehab, receiving physiotherapy from April 13, 2015, through April 21, 2015.[3] Daniel transferred to treatment with Dr. James Dyess, an internal medicine doctor, who continued to treat Daniel for pain management at the time of trial. Dr. Dyess prescribed pain medication, recommended physical therapy, and ordered cervical and lumbar MRIs. The cervical MRI testing revealed a minor posterior disc bulge at the C3-4 level resulting in narrowing of the central canal ventrally, without spinal cord impingement, and straightening of the cervical lordosis, possibly associated with muscle spasm. The lumbar MRI test revealed minor disc bulges at the L3-4 and L5-S1 without stenosis, foraminal restriction, or impingement, as well as a restriction at the L4-5 level associated with a disc protrusion superimposed on a generalized disc bulge including minor *825 contact of the descending L5 nerve roots.
Following receipt of the MRI results, Dr. Dyess referred Daniel to Dr. Rand Voorhies, a neurosurgeon, for evaluation. Dr. Voorhies examined Daniel on September 28, 2015. After a physical examination and review of the imaging and other records, Dr. Voorhies diagnosed Daniel with axial joint pain of the cervical and lumbar spines with potential pain generators at the C3-4 and L4-5 levels. He subsequently ordered a SPECT scan, which is a bone scan doctors use in conjunction with an MRI or CT scan for more advanced imaging to determine whether inflammation or pain is present.[4] The scan reflected that at the L4-5 level, there was a loss of water content which could indicate a pain generator in someone as young as Daniel. The scan also reflected potential pain generators at the C3-4 level. The physical exam revealed normal strength and reflexes in lumbar spine, which indicates no nerve damage. Dr. Voorhies testified that the MRI and SPECT imaging support Daniel's complaints of pain. Dr. Voorhies testified that Daniel's symptoms are related to the accident at issue. Dr. Voorhies confirmed that Daniel would be prohibited from playing baseball or participating in any extracurricular activities that require a similar level of physical activity.
In January 6, 2017, Daniel underwent an injection procedure at Southern Brain and Spine at the L5 level. On February 3, 2017, Dr. Justin Lundgren, with Southern Brain and Spine, met with Daniel and found that "he has failed epidurals. He has failed therapy. He continues to do med management...I think it may be a matter of time that helps him most.... I do not think that a surgical option is something we are going to pursue." Neither Dr. Lundgren nor Dr. Voorhies recommend surgery, and Dr. Voorhies stated that he always recommends avoiding surgery whenever possible. At the time of trial, Dr. Dyess continued to treat Daniel and monitor his pain management through prescription narcotic medication.
Daniel testified that, at the time of the accident, he was employed as a foreman with Beverly Construction. Following the accident, he missed approximately one week of work but returned to work primarily because he was concerned about providing for his family.[5] Daniel still remained employed with Beverly Construction at the time of trial. Byron Dupree, the General Superintendent with Beverly Construction, testified that Daniel has worked for Beverly Construction for approximately five years, and was promoted from a laborer to a foreman within the first year or so of his employment. He testified that Daniel is an "excellent employee" and a "company person," who is dependable, honest, and straightforward. He is happy with Daniel as an employee and is willing to work with Daniel to "get through this" to keep him employed.
Mr. Dupree testified that Daniel had no physical limitations whatsoever prior to the accident. However, "from that day on, he hasn't been able to do what he is normally capable of doing or what he was in the past." He stated that Daniel must now take breaks in the middle of the day to sit in his truck to get off of his feet. He testified that if Daniel had never been injured in the accident, he would think that Daniel would have advanced in the company and made more money, because most of those positions require physical labor;
*826 however, he was unable to say with certainty which position Daniel may have qualified for or whether Daniel would have made more money.
Daniel testified that the effects of the accident are still an "every day battle" for him. He stated that he has shooting pains from his back to his feet and that he can't stay in one position, sitting or standing, for too long or sleep through the night without tossing and turning.
Daniel explained his strong desire to wean himself off of the narcotic pain medication Dr. Dyess prescribes, stating that the medication makes him "lazy." However, he stated that the physical therapy he participated in did not relieve any pain and that he must take the pain medication daily to continue to work full-time. Daniel described the accident as "life-changing." He further testified that the consequences of the accident have taken a huge toll on his marriage and that the narcotic pain medication causes him to "lash out" on his wife and children.
Daniel and Tamara have been married approximately nine years with two small children, five and seven years old. Tamara testified as to the effect the accident has had on their family. She stated that the accident has had a major impact on their relationship; that Daniel is now a hermit and is not able to play softball or socialize and do the other outdoor activities that he loves; has gained 25-30 pounds since the accident and no longer works out or exercises; and cannot help decorate the house for holidays, Tamara's most anticipated seasonal activity as a family.
She stated that Daniel is not his "true self" when on the narcotic pain medication. Tamara gave the example of she and Daniel bringing their two children to the pumpkin patch in the fall. She stated that Daniel would go but would take his medicine before-hand, knowing that he would be walking for a period of time, and that he would not be himself during the outing with the kids. Tamara testified that her children are not growing up with the same Daniel that she married. She is concerned that Daniel may become addicted to the medication and never be able to cease the medicine. She agrees that Daniel is now lazy at home, requiring her to learn how to work a weed eater and lawnmower to take care of the outdoor chores that Daniel took care of before the accident.
Daniel and Casey's father, Gerard Latulippe, testified that he is very active in his children and grandchildren's lives. He attends his grandchildren's baseball games and visits with his children on a very regular basis, at least once a week. Mr. Latulippe testified that he arrived to the hospital on the evening of the accident and knew that his sons were injured. He stated that, generally both of his boys, Casey and Daniel, "walked with a confidence level and I didn't see it" that night at hospital. He described Daniel as "strong" as an "ox"[6] with no prior neck or back injuries or complaints.[7]
Mr. Latulippe testified that softball was a "cherished sport" for the whole family. He stated that he played baseball and his boys played baseball their entire lives, and still participated in softball tournaments with friends and family as adults up until *827 the accident. He testified that Daniel played semi-pro baseball with the Sugar Cane Baseball League. When asked if the family played softball since the accident, Mr. Latulippe responded, "None. None." He further stated that Casey and Daniel cannot participate in any other outdoor activities they used to enjoy as a family, such as fishing or four-wheel riding.
Casey and Hannah Latulippe
At the time of the accident, Casey was seated in the passenger seat in his brother's truck commuting home to Slidell from his work with Beverly Construction. He testified that he was exhausted from work that day and was seated with his head hung down and hunched over at the time of impact. Following the accident, Casey also sought treatment from Slidell Memorial Hospital's emergency department complaining of neck and back pain. After normal X-ray and CT results, Casey was diagnosed with whiplash, a cervical sprain and strain, and back pain and was discharged with pain medication and instructed to follow-up with a primary physician. Casey also treated briefly with New Orleans East Medical Rehab from April 13, 2015 to April 21, 2015. While treating with New Orleans East Medical Rehab, Casey reported that he experienced mid-back pain with a pain rating of 7 out of 10, 100% of the time, and neck pain with a pain rating of 6 out of 10, 75% of the time.
Casey began treatment with Dr. Dyess on April 27, 2015, and continued to treat with Dr. Dyess on a monthly basis through the time of trial. Dr. Dyess testified that from the time of his initial treatment, Casey would "pull away" at each exam and that Casey's pain was visible and genuine. Dr. Dyess ordered lumbar and cervical MRIs, which reflected multiple bulges and herniations in the cervical, thoracic, and lumbar spines. Dr. Dyess referred Casey to Dr. Voorhies, a neurosurgeon, for examination and consultation.
Dr. Voorhies testified at trial that he first examined Casey on August 17, 2015. At that time, Dr. Voorhies' records reflect that Casey had a "component of psychological and emotional distress due at least in part to worries about employability and income." Dr. Voorhies reviewed Casey's MRI and other test results, which reflected multiple herniations and abnormalities in the cervical, thoracic, and lumbar spines. Concerning Casey's thoracic spine, Dr. Voorhies testified the imaging results revealed "potentially dangerous anatomic abnormalities...[s]ome of which are quite large and impressive and dangerous looking from a neurological perspective...." In his December 21, 2015 report, Dr. Voorhies explained that Casey has a T4-5 central midline disk herniation that is "producing deformity of the spinal cord itself" and that the T4-5 level "is the most frightening level as it is extremely difficult to approach surgically particularly when the herniation is midline." He testified that the thoracic abnormalities do not have the appearance of something that has been present for a long time; they appeared new. Dr. Voorhies testified that impingement on the spinal cord, as is reflected on Casey's imaging results, can cause both pain and paralysis. However, he testified that surgery at that level is also "rare and extremely dangerous and, thus, given Casey's normal neurological exam, surgery should not be considered" at that time. He could not say with a degree of medical certainty whether Casey will need thoracic surgery in the future.
At trial, Casey testified that Dr. Voorhies' explanation of his thoracic MRI results were devastating. Casey testified that Dr. Voorhies indicated that he should "watch every move I make," because, "a slip and fall, another accident...could *828 cause me to be paralyzed." He further testified that Dr. Voorhies discussed the possibility of surgery with him, which involved cracking his chest open to reach the midline thoracic area.
Dr. Voorhies testified that the "multiple disc herniations in the thoracic spine...was a bigger problem than [he] wished to tackle," and he referred Casey to Dr. Tender with LSU, one of Dr. Voorhies' former students. He also referred Casey to Dr. Wakeman for psychological therapy based upon the emotional concerns he expressed to Dr. Voorhies.[8]
Dr. Tender first examined Casey on January 27, 2016, reviewed the previous MRI studies, and instructed Casey to return the following year for repeat MRI studies. Prior to the second MRI studies, on November 2, 2016, Dr. Patrick Waring, an anesthesiologist and pain management doctor, performed medical facet blocks at the T4-5 and T5-6 levels.[9] At that time, Casey complained primarily of headaches and neck and interscapular/thoracic pain, and chronic low back pain with intermittent leg pain. Dr. Waring testified that Casey's complaints are consistent with his test results reflecting disc displacement and significant abnormalities at multiple levels of the lumbar, cervical, and thoracic spines. Casey reported no relief from the November 2016 facet blocks. On February 2, 2017, Dr. Waring performed an epidural steroid injection at the T3-4 level, which had minimal effect on Casey's pain. Dr. Waring testified that the accident more likely than not caused Casey's pain symptoms but he deferred to the treating neurologist, Dr. Tender, on the issue of causation. Dr. Waring was unable to state with certainty whether the abnormalities in Casey's cervical, thoracic, and lumbar spines were related to the accident or were degenerative and pre-existing.
Casey returned to Dr. Tender to undergo follow-up MRI studies in 2017, which still reflected herniations in the thoracic spine at the same levels. On January 27, 2017, Casey also underwent a SPECT imaging, a 3D fusion of the cervical spine, and a CT of the cervical spine without contrast with radio nuclei bone scan fusion. The nuclear scan showed increased activity at the C4-5 and 5-6 disc levels and mild increased activity at the C3-4 and 6-7 levels. Dr. Tender opined that the two herniated discs in the cervical spine at the C4-5 and 5-6 levels are the "true pain generator[s]." He stated that if Casey were to need surgery in the future, he would need a two-level arthroplasty, but that he recommends continuing with conservative treatment given Casey's young age.
Dr. Tender reviewed Casey's extensive imaging test results. Concerning Dr. Voorhies' opinions, Dr. Tender stated his opinion that Dr. Voorhies' reaction was a "little dramatic." Dr. Tender testified to his opinion that Casey's spinal cord still had sufficient fluid surrounding it to protect it and found paralysis unlikely but not impossible. He further testified that he "rarely see[s] thoracic disc herniations, period. And this may be the first one related to an accident." Given the severity of the surgery and Casey's young age, he does not recommend surgery. However, surgery in the future will depend on the severity of pain and how long it continues. Concerning limitations, Dr. Tender said there were no *829 neurological limitations and that physical limitations would be limited based upon Casey's level of pain.
When questioned concerning the origination of Casey's cervical and thoracic spine herniations, Dr. Tender testified that the question is a difficult one to answer. He testified that it is unlikely for a 25-year-old healthy male to have herniations, but that it is also unlikely for a motor vehicle accident to cause such herniations. He testified that Casey's thoracic and cervical herniations were most likely degenerative in nature and not related to direct trauma, although he acknowledged the herniations could possibly have been caused by the accident. Nevertheless, Dr. Tender testified with certainty that Casey's symptoms were causally related to the accident. He further testified that, because of the thoracic and cervical protrusions and herniations, Casey is more susceptible to further injury following subsequent trauma. Dr. Tender ultimately recommended that Casey participate in physical therapy with aquatherapy if possible and to wean himself off of the pain medication.
Casey testified that he still experienced pain on a daily basis at the time of trial, even while taking pain medication. He further testified that Dr. Tender recommended that he should undergo a thoracic MRI each year for the rest of his life to monitor the thoracic spine. Casey testified that he is "open to do surgery" and anticipates that it will be necessary at some point in time.
Dr. Andrew Todd, a board certified orthopedic surgeon, examined Casey on May 26, 2017, for the purposes of conducting an independent medical examination (IME). Dr. Todd testified at trial that it was more likely than not that Casey's disc herniations predated the accident and further that Casey is not a surgical candidate at this time. However, Dr. Todd also determined that the accident exacerbated the preexisting disc herniations and further, he found no evidence whatsoever of "wandell signs"-meaning that he found no evidence that Casey exaggerated or lied about the severity of his pain symptoms. Dr. Todd agreed that Casey is prescribed a significant amount of narcotic pain medication and that, at this point in time, physical therapy is the only treatment that will allow Casey to improve while weaning himself from the pain medication.
At trial, Casey testified that he was "healthy as an ox" before the accident and was a very active outdoorsman-fishing, hunting, racing cars, softball, anything outside.[10] His testimony corroborated Daniel's and Mr. Latulippe's that playing softball was a family tradition. Casey testified that even his 90-year-old grandma would go watch the softball games, "rooting us on, cursing us out...just a good old family get-together."
Prior to the accident, Casey worked for Beverly Construction as a laborer. He testified that he hoped to leave the manual labor field and become a policeman with the New Orleans Police Department. He testified that he applied for a position, and, weeks before the accident, was accepted to begin the process of taking a written and physical exam. However, after the accident, he knew he would not be able to pass the physical portion of the exam and never pursued that employment. He was unemployed for approximately six to seven months, was depressed, and gained approximately 45 pounds. He testified that *830 during that time he applied for numerous entry-level jobs to no avail. However, he stated that after his period of unemployment, Unfolded, a paint distribution company, "saved [his] life" and offered him a position as a distribution coordinator, an employment opportunity that he described as a "miracle." Casey testified that he earns an approximately $50,000.00 annual salary, which is more than he earned with Beverly Construction prior to the accident. He testified that Unfolded has been very accommodating and has purchased a special chair to support his back and neck as well as allowed him to work from home on occasion when he is in pain. However, he testified that he will unlikely be able to move up with the company because he cannot do any of the physical labor required for a warehouse manager position. He also fears that, being the lowest person on the totem pole and unable to do physical labor required of most positions for the company, he may be the first to be let go.
Scott Rickert, a self-employed distributor for a decorative paint product, Unfolded, testified that Casey has been working for him since February of 2016. He testified that, unfortunately, Casey is not able to do some of the physical aspects of his job that Unfolded "need[s] him to do" like pick up boxes and load trucks, but that Casey is a hard worker and a great employee. Mr. Rickert testified that he has made accommodations for Casey, including purchasing a certain chair to support his neck and back, as well as allowing him to work remotely on occasion when he leaves for doctor's appointments or is in too much pain to come into the office.[11] Mr. Rickert testified that from the time of hire until the time of trial, Casey appears to be in some "discomfort on a daily basis." Mr. Rickert testified that Casey unfortunately could likely not be promoted to a warehouse manager because he is unable to perform the labor intensive duties required of that position.
Casey's father, Mr. Latulippe, testified that Casey was very active prior to the accident and never had any neck or back injuries. He testified that Casey had to leave his job at Beverly Construction because he was a "liability" and could not perform the job. Mr. Latulippe further testified that Casey was afraid to hold his newborn daughter after the accident because his fingers would get tingly after holding her and he feared that he would drop her. He noticed himself that Casey's wife, Hannah, took on more responsibility in the home after the accident.
Hannah testified that she and Casey have been married three years. She testified that, before the accident, she and Casey lived a very active lifestyle-tubing, jet skiing, fishing and spending a lot of time on the water in their friends' boats, and other household activities like working in the yard. She stated that they dated for eight years prior to getting married and that she spent a lot of time with Casey's friends and played softball with Casey's entire family. She corroborated Mr. Latulippe's testimony that softball was a cherished family sport and that family members would make team T-shirts and cheer each other on.
Hannah testified that she attended the doctor's appointment with Dr. Voorhies during which Dr. Voorhies informed her that Casey has a risk of paralysis if he is injured again. She said the ride home from Dr. Voorhies office was very quiet and that they talked and prayed about that concern *831 regularly. She expressed her concern that Casey has to travel for work and that she worries, "if someone hits him again," that he could become paralyzed. Since that appointment, she worries that Casey will not be able to walk their daughter down the aisle or participate in activities with her as she grows. She said that, after the accident and that appointment, Casey went into a deep depression and was not himself. She further expressed concern about his prolonged use of narcotic pain medication and whether it will affect her ability to conceive to expand their family. Hannah testified that she and Casey bought a special bed that allows Casey to sleep sitting up.
Hannah stated that the accident has greatly affected their relationship. Hannah works full-time as a teacher and Casey does not help out around the house like he did before the accident. Hannah testified specifically that the period of time during which Casey was unemployed was very difficult and caused tension between them because she would come home after working full-time and Casey had been lying on the sofa all day and did not do any household chores. Prior to the accident, Casey loved to cook and cooked every meal but since the accident he is never in the kitchen. Hannah stated that Casey does not help with their 18-month-old daughter and has never bathed her because he cannot bend down into the bathtub and lift her.
Jace Lacoste, Casey's best friend since eighth grade, testified at trial that Casey had no physical restrictions prior to the accident at issue. He testified that he and Casey played baseball every day together in high school and that he and Casey would go fishing on his boat, car racing, and four-wheeling on his family's property in Kentwood regularly. He stated that, after the accident, he asked Casey to go down to his property in Kentwood to go four-wheeling. He testified that Casey got on the four-wheeler and immediately said, "no, never again" due to his pain and the risk of future injury. Jace testified that he and Casey's friendship has changed and the accident has distanced them because he still engages in all of the outdoor activities he and Casey enjoyed together before the accident, but Casey is unable to participate in any of those activities.
At trial, WJMC introduced into evidence certain Facebook posts, which indicated that Casey and Daniel had a strong desire to help flood victims in Baton Rouge and Texas during the 2016 and 2017 hurricane seasons. Casey testified that in August 2016 he went to Baton Rouge for one day, used a boat to drive up to people's front door, and helped people into the boat to drive them to dry land. He indicated it was not terribly physically involved as he drove the boat in standing water to allow people to climb into the boat. He further testified that he really wanted to help out after some flooding in Texas in August 2017, but that never took place.
On November 28, 2017, the trial judge issued his judgment. The judgment awarded Daniel Latulippe $150,000.00 in general damages and $37,140.75 in special damages for past medical treatment and awarded Casey Latulippe $200,000.00 in general damages, $53,659.66 in special damages for past medical treatment, and $11,000.00 for past wages. The trial court further awarded Daniel and Casey the cost of physical therapy for eighteen months, for a total of $19,800.00 each, as well as prescription medication costs for a 24 month period, totaling $1,920.00 each.[12] The trial court judgment further awarded Tamara and *832 Hannah Latulippe $40,000.00 each for their loss of consortium claims.
DISCUSSION
Both parties have appealed the trial court judgment. On appeal, WJMC asserts that the trial court abused its discretion in its award of general damages to plaintiffs (Casey, Daniel, Tamara, and Hannah), contending that each award is abusively high, and further that the trial court erred in awarding to Daniel and Casey future medical payments for physical therapy. Plaintiffs filed an answer to the appeal, contending first that the $200,000.00 general damages award to Casey was abusively low and further that the trial court erred in failing to award damages to Daniel and Casey for their diminished earning capacity claims.
First, as to an award of general damages, this Court has recently stated:
General damages are those which may not be fixed with pecuniary exactitude; instead, they 'involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or lifestyle which cannot be definitely measured in monetary terms.' Bellard v. Am. Cent. Ins. Co. , 07-1335 (La. 4/18/08), 980 So.2d 654, 674, quoting Duncan v. Kansas City Southern Railway Co. , 00-66 (La. 10/30/00), 773 So.2d 670. The assessment of the appropriate amount of damages, by a trial judge or jury, is a determination of fact, one entitled to great deference on review. Joseph v. Neth. Ins. Co. , 15-549 (La. App. 5 Cir. 2/24/16), 187 So.3d 517, 519, citing Wainwright v. Fontenot , 00-492 (La. 10/17/00), 774 So.2d 70, 74. The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Id. Before a court of appeal can disturb an award made by a fact finder, the record must clearly reveal that the trier of fact abused its discretion in making its award. Thibodeaux v. Donnell , 16-570 (La. 1/20/17), 219 So.3d 274, 278, citing Coco v. Winston Industries, Inc. , 341 So.2d 332, 332 (La. 1976). Only after making the finding that the record supports the notion that the lower court abused its great discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point reasonably within the discretion afforded that court. Id. (See also, Youn v. Maritime Overseas Corp. , 623 So.2d 1257, 1260 (La. 1993), where the Louisiana Supreme Court found, "Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion.") It is never appropriate for a court of appeal, having found that the trial court has abused its discretion, to simply decide what it considers an appropriate award on the basis of the evidence. Thibodeaux, supra .
Woods v. Winn - Dixie Montgomery, L.L.C. , 17-707 (La. App. 5 Cir. 6/27/18), 251 So.3d 675, 2018 WL 3131531, 2018 La. App. LEXIS 1294.
Therefore, the trial court's assessment of the appropriate amount of damages is a determination of fact, one entitled to great deference on review. Id. Further, an appellate court on review of a trial court's general damages award may not decide what it considers to be an appropriate award but must first only consider whether the trial judge clearly abused his great discretion. Sanchez v. Steve Dubuc , 12-526 (La. App. 5 Cir. 2/21/13), 110 So.3d 1140, 1145. Because the discretion *833 vested in the trier of fact is so great, and even vast, an appellate court should rarely disturb an award on review. Guillory v. Lee , 09-0075 (La. 6/26/09), 16 So.3d 1104, 1117 (quotations omitted); Youn v. Maritime Overseas Corp., et al. , 623 So.2d 1257, 1261 (La. 1993), reh'g denied , 10/7/93.
In his oral reasons for judgment, the Honorable Scott Schlegel found both Daniel and Casey to be credible witnesses. He made the factual finding that, although he could not relate any of the disc damage necessarily to the accident, both Daniel and Casey were asymptomatic prior to the accident and were rendered symptomatic as a result of the accident.[13] He further made the factual finding that Daniel and Casey and their families had very active lifestyles before the accident and that their lives have been "completely upended" by the accident.
As to Daniel, who was still treating with Dr. Dyess at the time of trial, the trial judge found that he suffers daily from a significant level of pain as a result of his multiple lumbar disc herniations rendered symptomatic by the accident. The court found that "the pain is clearly high for Daniel and still remains high" which affects his daily work and home life. The trial judge found, based upon the medical evidence presented, that Daniel is not a surgical candidate but rather would benefit from aggressive physical therapy and weaning off of the pain medication.[14]
The medical testimony and evidence presented at trial reflects that Daniel, who was 28 at the time of the accident, will likely continue to experience pain for the duration of his life. At trial, Daniel described the accident at issue and the resulting chronic pain as "life changing." Based upon the testimony and evidence presented at trial, we cannot say that the trial judge abused his vast discretion in awarding Daniel $150,000.00 in general damages for his injuries with life-long effects.
As to Casey, the trial judge summarized Casey's medical treatment, including his multiple thoracic, cervical, and lumbar disc herniations made symptomatic as a result of the accident. The trial judge found that Casey, who was also still treating at the time of trial, suffers from significant pain, finding that Casey experiences "more pain than Daniel" and that "the pain is real." The testimony at trial reflects that Casey, soon after the accident, reported great worry and concern of being able to work and provide for his family. The evidence at trial shows that he was laid off from his job with Beverly Construction, was unemployed for a period of six to seven months, and was unable to pursue his dream of becoming a New Orleans police officer.
*834 The medical testimony and evidence presented at trial reflects that Casey, who was 24 years old at the time of the accident, will more likely than not have chronic pain for the duration of his life. Further, the medical testimony indicated the possibility of a future surgery should the pain worsen as he ages, which has caused Casey and his wife to worry about the possibility of future surgery or paralysis.[15] The trial judge found that the medical testimony and evidence presented reflects that Casey would benefit from aggressive physical therapy and weaning off of the pain medication.[16] Upon review of the record in this matter, we cannot say that the trial judge abused his vast discretion in awarding Casey $200,000.00 in general damages.
As to Tamara and Hannah, the trial judge found:
These are young families with young children. These were active lifestyles that these families had, and the Court finds that their lives have been completely upended by this accident. They used to go to ballparks, they used to go out. Their social lives have changed. Their care for their children, their responsibilities, everything has changed....
The testimony at trial supports the trial court's findings. The record reflects that both spouses have serious concerns about the amount of narcotic pain medication Daniel and Casey both require on a daily basis to continue with their employment and function to support their families. Tamara and Hannah both testified that their spouses are no longer able to share duties in household chores and that neither can enjoy the active lifestyle they once envisioned for their family. Tamara has two young boys whose father cannot play or coach baseball with them. Hannah testified that Casey cannot bathe their daughter or hold her for a long period of time. Hannah further testified that she is constantly in fear that any future injury will result in Casey's paralysis and is concerned about the long-term use of narcotic pain medication and its potential effect on their decision to expand their family. Upon consideration of the record, we find that the trial judge did not clearly abuse his great discretion in awarding $40,000.00 in general damages each to Tamara and Hannah for their loss of consortium claims.
An appellate court may not overturn an award for general damages unless it is so out of proportion to the injury that it shocks the conscience. Ursin v. Russell , 07-859 (La. App. 5 Cir. 2/6/08), 979 So.2d 554, 560. Upon our thorough review of the record in this matter, we do not find that the general damage awards to the plaintiffs shock the conscience and, thus, we find that the trial judge did not clearly abuse his great discretion in the award of general damages to each plaintiff.
WJMC further assigns as error on appeal the trial court's award to Daniel and Casey of 18 months of physical therapy, contending that the record does not support any award for physical therapy. An award of future medical expenses is justified if the plaintiff presents medical testimony that the expenses are indicated and further sets forth the probable cost for the medical treatment.
*835 Hanks v. Seale , 04-1485 (La. 6/17/05), 904 So.2d 662, 672. Although future medical expenses must be established with some degree of certainty, they do not have to be established with absolute certainty, as an award for future medical expenses is by nature somewhat speculative. Schexnayder v. State, Dep't of Transp. & Dev. , 14-0458 (La. App. 1 Cir. 11/07/14), 2014 WL 5800549, 2014 La. App. Unpub. LEXIS 652. An appellate court, in reviewing a fact-finder's factual conclusions with regard to special damages, must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusions, and the finding must be clearly wrong. Guillory v. Lee , 09-0075 (La. 6/26/09), 16 So.3d 1104, 1117-18.
A review of the testimony and evidence presented at trial supports the trial court's award of medical expenses for future physical therapy. Although Daniel and Casey each only attended physical therapy for a brief period of time soon after the accident, their testimony is clear that they found the narcotic pain medication to be more effective in alleviating their pain so that they were able to work and provide for their families. However, Daniel and Casey's testimony is also clear that they are concerned about the significant amount as well as the length of time that they have taken pain medication. Tamara and Hannah testified to their concerns that Daniel and Casey have been taking narcotic pain medication for too long and also expressed their desire to help Daniel and Casey wean off of the medicine.
The uncontroverted medical testimony, including that of Dr. Todd, WJMC's orthopedist who performed Casey's IME, supports a finding that physical therapy is the only other remaining viable treatment option for Daniel and Casey. Given the trial judge's vast discretion in awarding damages, we cannot find that the trial court's award is unsupported by the record or clearly wrong. See Guillory, supra .[17]
In the final assignment of error, plaintiffs challenge the trial court's denial of an award to Daniel or Casey for diminished future earning capacity. Concerning such claims, this Court has stated:
When considering an award for loss of earning capacity, the burden is on the plaintiff to prove that because of his injuries, he has suffered a loss of income. LeBlanc v. Allstate Ins. Co. , 00-1128 (La. App. 5 Cir. 11/28/00), 772 So.2d 400, 405, writ denied , 00-3522 (La. 2/9/01), 785 So.2d 831. A plaintiff who seeks to recover for loss of earning capacity must prove the extent of his injuries resulting from the accident and also has the burden of proving that the injuries he sustained have incapacitated him from doing work of reasonable character in the future, that is, work for which he was fitted by training and experience, of same or similar kind in which he was engaged at the time of the accident. Richard v. Wal-mart Stores, Inc. , 29,926 (La. App. 2 Cir. 10/31/97), 702 So.2d 79,89.
Archangel v. Mayeaux , 12-696 (La. App. 5 Cir. 5/30/13), 119 So.3d 786, 790.
After our thorough review of the evidence contained in the record and applying the above-discussed principles as they relate to the vast discretion given to the finder of fact, we cannot say the trial judge abused his discretion in declining to award *836 any amount for loss of earning capacity to Daniel or Casey.
As to Daniel, the trial judge found the testimony at trial to be "purely speculative." Daniel is still employed with Beverly Construction in the same position he was placed before the accident with no evidence that his salary has decreased since the accident.[18] Further, Daniel's supervisor, Mr. Dupree, testified that Daniel is an excellent employee. Although Mr. Dupree testified that he would "think" Daniel would have been promoted to a manager position had he not been injured in the accident, he did not indicate that Daniel's earnings would be any higher than his current salary or that Daniel would be interested in that position. Further, although Dr. Voorhies, upon request, estimated Daniel's whole person impairment rating as 13% in a one-page report, the trial judge discredited Dr. Voorhies' opinion finding that he had not seen the patient for nearly two years at the time he rendered that opinion.
As to Casey, the record reflects that at the time of trial he worked for a paint distributor, Unfolded, making a higher salary than he made before the accident with Beverly Construction. Although Casey's supervisor, Mr. Rickert, testified that Casey would likely not meet the requirements for a warehouse manager position with the company because of his physical limitations, he testified that Casey is an excellent employee and that he intends to keep Casey employed. Further, although Dr. Voorhies opined that Casey has a 25% whole person impairment rating, the trial judge again discredited that opinion because Dr. Voorhies had not seen the patient in nearly two years. Dr. Todd, who performed the IME, found that Casey was not disabled in any way.
Future loss of earnings is inherently speculative, but must be proved with a reasonable degree of certainty; purely conjectural or uncertain future loss earnings will not be allowed. Burgard v. Allstate Ins. Co. , 04-1394 (La. App. 5 Cir. 5/31/05), 904 So.2d 867, 879. Based upon the evidence presented at trial, we cannot say that the trial judge clearly abused his discretion in failing to award damages for Daniel's and Casey's loss of earning capacity claims.
CONCLUSION
Accordingly, for the reasons provided herein, the trial court judgment is affirmed.
AFFIRMED

Mr. Braun was dismissed from the litigation prior to trial.

Plaintiffs filed suit in Civil District Court for the Parish of Orleans. After WJMC filed an exception of improper venue, the matter was transferred to the 24th Judicial District Court.

The record reflects that both Casey and Daniel felt that New Orleans East Medical Rehab was a waste of their time and did not effectively treat their injuries.

Dr. Voorhies testified that a pain scan does not exist, but that the SPECT scan is the closest technology available.

Daniel clarified that he did not lose any wages because he is a salaried employee.

Daniel described himself physically as a "beast."

Daniel testified that he has been involved in two previous motor vehicle accidents. He testified that he sought emergency room treatment for one accident but no follow-up treatment thereafter and sought no treatment following the second accident. He stated neither accident resulted in a lawsuit and that he never made a claim for bodily injury following any accident.

Voorhies examined Casey on August 17, 2015, September 28, 2015, and December 21, 2015. Dr. Tender opined these two herniated discs in the cervical spine are "true pain generator[s]."

Dr. Waring also treated Casey on December 13, 2016, and February 2, 2017.

Casey testified that he sought treatment for a lower back injury when he tripped and fell on a dumbbell, but that he recovered within one day from that injury. He reported no other prior injuries.

Mr. Rickert estimated that Casey leaves work early approximately two to three times per month due to his pain.

The trial court ordered that the amount awarded for future medical treatment and prescriptions be placed in a revisionary trust in accordance with La. R.S. 13:5106(B).

It is well-settled that a tortfeasor takes his victim as he finds him and when a defendant's tortious conduct aggravates a pre-existing condition, the defendant must compensate the victim for the full extent of the aggravation. Maranto v. Goodyear Tire & Rubber Co. , 94-2603 and 94-2615, p. 3 (La. 2/20/95), 650 So.2d 757, 759. The plaintiff, however, is required to establish a causal link between the tortious conduct and the aggravation of the pre-existing condition. The test to determine if that burden has been met is whether the plaintiff proved though medical testimony that it is more likely than not that the subsequent injuries were caused by the accident. Guillory v. Lee, 09-0075 (La. 6/26/09), 16 So.3d 1104, 1124. In this case, the uncontroverted medical testimony and evidence was that Daniel's and Casey's pain symptoms were causally related to the accident.

The trial judge, in his oral reasons, stated that he considered Dr. Dyess as a historian, "nothing more," and that he relied only on the expert opinion of the neurologists who testified concerning the medical evidence presented.

The trial judge found that Dr. Voorhies "scared the heck out of" Casey and his family but that, at this time, there is no recommendation for surgery or real concern for paralysis.

The trial judge, in his oral reasons, stated that he considered Dr. Dyess as a historian, "nothing more," and that he relied only on the expert opinion of the neurologists who testified concerning the medical evidence presented.

Although WJMC assigns as error the awarding of physical therapy expenses and does not specifically assign as error the trial court's calculation of damages, we find the record reflects that plaintiff introduced SpineCare and Action Physical Therapy and Sports Medicine records, as well as other related medical records, reflecting the approximate cost for plaintiffs' physical therapy sessions.

Plaintiffs did not introduce any W-2s, tax returns, or other documentation to reflect their salaries before or after the accident.