| | |
|---|---|
| WALTER G. LYONS AND KATHLEEN LYONS | NO. 23-CA-419 |
| VERSUS | FIFTH CIRCUIT |
| STATE OF LOUISIANA THROUGH LOUISIANA STATE UNIVERSITY HEALTH SCIENCES CENTER AND LOUISIANA STATE UNIVERSITY MEDICAL CENTER, ET AL | COURT OF APPEAL |
| | STATE OF LOUISIANA |

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 806-141, DIVISION "I"
HONORABLE NANCY A. MILLER, JUDGE PRESIDING

November 07, 2024

**JUDE G. GRAVOIS**
**JUDGE**

Panel composed of Judges Susan M. Chehardy,
Jude G. Gravois, and Marc E. Johnson

**JUDGMENT AMENDED AND AFFIRMED AS AMENDED**
    **JGG**
    **SMC**
    **MEJ**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Morgan Naquin
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLANT,
WALTER G. LYONS AND KATHLEEN LYONS
      Walter C. Morrison, IV
      Rachel M. Naquin

COUNSEL FOR DEFENDANT/APPELLEE,
LARRY HOLLIER, M.D., CLAUDIE SHEAHAN, M.D. AND THE STATE OF
LOUISIANA, THROUGH LOUISIANA STATE UNIVERSITY HEALTH
SCIENCES CENTER AND LOUISIANA STATE UNIVERSITY MEDICAL
CENTER
      Peter J. Wanek
      Samantha S. Boudreaux

**GRAVOIS, J.**

Plaintiffs, Walter G. Lyons and Kathleen Lyons, appeal the jury verdict in this medical malpractice action. The questions on appeal are as follows: Did the trial judge err in denying plaintiffs' motion for a directed verdict regarding comparative fault? Did the jury err in apportioning 75% fault to Mr. Lyons for his damages? Did the jury err in failing to award Mr. Lyons his full damages for past medical expenses, and in failing to award any damages for future medical expenses and permanent disability? Did the jury award abusively low damages for pain and suffering? Finding in the affirmative on all of these questions, we amend the judgment and affirm as amended, as fully described below.

This is a medical malpractice case. Plaintiffs sued Mr. Lyons's vascular surgeons, Dr. Claudie Sheahan and Dr. Larry Hollier, after Mr. Lyons received an excessive dose of radiation during a lengthy surgery to repair an endoleak, which was a complication of a previous repair of an aortic aneurysm.[1] The excessive dose of radiation caused severe radiation burns to Mr. Lyon's left hand and left flank, ultimately resulting in the amputation of his left hand above the wrist.

After a four-day trial, the jury found that plaintiffs had established the standard of care applicable to Drs. Sheahan and Hollier, that Drs. Sheahan and Hollier had breached the standard of care when treating Mr. Lyons, and that their breach of the standard of care caused Mr. Lyons to suffer damages that he otherwise would not have incurred. This constitutes a finding of medical malpractice as per La. R.S. 40:1231.1(13) and (22).[2] However, the jury further

_____

[1] Other defendants were also sued but did not go to trial. This appeal concerns only Drs. Sheahan and Hollier. The surgeon who performed the previous aneurysm repair, Dr. E. Rigdon, was not a defendant herein.

[2] La. R.S. 40:1231.1(13) and (22) provide in pertinent part:

(13) "Malpractice" means any unintentional tort or any breach of contract based on health care or professional services rendered …

(22) "Tort" means any breach of duty or any negligent act or omission proximately causing injury or damage to another. The standard of care required of every health care provider, except a hospital, in rendering

found that Mr. Lyons failed to exercise a reasonable degree of care for his own care and this conduct contributed to the amputation of his hand. The jury then allocated 25% fault to Drs. Sheahan and Hollier, collectively, and 75% fault to Mr. Lyons.

The jury awarded the following damages: $30,000 for Mr. Lyons's physical pain and suffering; $30,000 for Mr. Lyons's mental pain and suffering; $0 for Mr. Lyons's permanent disability; $42,000 for Mr. Lyons's past medical expenses; $0 for Mr. Lyons's future medical expenses; $50,000 for Mr. Lyons's loss of enjoyment of life; and $100,000 for Mrs. Lyons's loss of consortium. These amounts were reduced to a total of $63,000, as per the jury's allocation of comparative fault, plus legal interest. A judgment consistent with the jury's verdict was entered on March 27, 2023.

Plaintiffs now appeal this judgment, assigning as error the trial court's failure to grant their motion for a directed verdict regarding comparative fault. They further argue that the jury's apportionment of fault was manifestly erroneous. They also argue that the jury's special and general damage awards were legally erroneous, particularly in the case of the jury's failure to award Mr. Lyons any damages for permanent disability and future medical expenses. They also argue that given the jury's finding of malpractice, the jury erred as matter of law in failing to award Mr. Lyons the full amount of his past medical expenses.

Drs. Sheahan and Hollier did not appeal the jury verdict. Accordingly, the part of the verdict finding that they committed medical malpractice and that Mr. Lyons would not have suffered his damages but for their negligence, is a final judgment, and is *res judicata*.

---

professional services or health care to a patient, shall be to exercise that degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill.

For the following reasons, we find merit to plaintiffs' appeal. After thorough consideration of this extensive record and the applicable law, we conclude that the trial court abused its discretion in denying plaintiffs' motion for a directed verdict as to Mr. Lyons's alleged comparative fault. We reverse the trial court's ruling on the motion for a directed verdict, grant the motion for a directed verdict, and accordingly amend the verdict to find defendants 100% at fault for Mr. Lyons's injury and plaintiffs' damages. We also amend the jury's award of past medical expenses to award the full amount of Mr. Lyons's past medical expenses in the amount of $704,218.68. Further, we conclude the jury was manifestly erroneous in failing to award Mr. Lyons any damages for future medical expenses, and thus further amend the jury's verdict to award Mr. Lyons future medical expenses in the amount of $395,775.00. We further conclude that the jury was manifestly erroneous in failing to award Mr. Lyons any damages for permanent disability, and that the jury's damage awards for physical pain and suffering, mental pain and suffering, and loss of enjoyment of life were abusively low, in light of the evidence before the jury. Those awards for permanent disability, physical pain and suffering, mental pain and suffering, and loss of enjoyment of life are increased to $750,000, *in globo*, and the judgment is further amended accordingly.[3] Finally, all appeal costs are assessed to defendants.

## FACTS AND PERTINENT PROCEDURAL HISTORY

In January of 2014, Mr. Lyons was a sixty-six-year-old civil engineer employed by a consulting engineering firm in Mississippi. He had previously retired as a district civil engineer with the State of Mississippi in 2007. He and his wife, Kathleen, had been married for 45 years[4] and had recently built a home on a

---

[3] However, as noted *infra*, this award of *in globo* general damages may be subject to the $500,000 cap provided for in La. R.S. 40:1231.2(B)(1).

[4] At trial, which took place nine years after the surgery, plaintiffs testified that they had been married 54 years.

70-acre "country place" near Holcomb, Mississippi. They had two grown children and a grandchild who lived nearby.

Previously, in 2012, Mr. Lyons underwent surgery to repair an aortic aneurysm with Dr. Edward Rigdon, a vascular surgeon in Mississippi.[5] The repair was successful but required regular surveillance. On January 21, 2014, at a regular appointment with Dr. Rigdon, a CAT scan of Mr. Lyons's aorta revealed the development of an endoleak, which is defined as the leaking of blood outside a stent graft (the previous repair) and within an aneurysm sac. Dr. Rigdon told Mr. Lyons that this time, the repair was beyond his expertise. He referred Mr. Lyons to Dr. Larry Hollier at Ochsner Medical Center in Metairie, a vascular surgeon whom he felt had the requisite expertise to perform this complicated surgical repair.

The procedure took place on February 24, 2014. Dr. Hollier was assisted by Dr. Claudie Sheahan. During this procedure, a catheter is inserted into the femoral artery in the groin, through which the surgeons manipulate tools up to the aorta and the site of the leak in order to perform the repair. For this procedure, Mr. Lyons lay in a supine position (lying horizontally with his face and torso facing up), with his arms at his sides, palms down, atop a special table that provides an x-ray source, while the fluoroscopy "arm" that moves freely around the top of the patient provides the doctors the ability to visualize the arteries as they locate the aneurysm and perform the repair.

Drs. Sheahan and Hollier testified that Mr. Lyons's endoleak was very challenging to repair; the procedure lasted much longer than the original estimate of an hour and a half. The surgeons recorded approximately 89.1 minutes of

---

[5] An aneurysm is a weakness in the wall of the blood vessel that causes it to "balloon." The aorta is the main and largest artery in the human body, leading from the heart down into the abdomen where it branches into smaller arteries. When discovered when they are small, aortic aneurysms are monitored for growth because as they enlarge, they are at risk for rupturing, which can be quickly fatal.

"fluoroscopy" time in a procedure that lasted over three-and-a-half hours.[6]

Because the surgery took longer than expected, Mr. Lyons was admitted overnight to the hospital instead of being discharged after recovery. After deeming the surgery a successful repair of the endoleak, the surgeons discharged Mr. Lyons the next day and he returned to Mississippi to convalesce. Plaintiffs alleged no malpractice regarding the endoleak repair itself, and the record is devoid of any complications in his recovery in that regard.

Around ten days after the procedure, on about March 4, 2014, Mr. Lyons, who is right-handed, developed an itchy rash on the palmar surface (the palm or the anterior surface of the hand) of his left hand, soon followed by the same on his left flank (the part of the body that spans from the bottom of the rib cage down to the hips on the left side of the spine).[7] Both sites soon became very painful and blistered. Mr. Lyons sought treatment from his regular dermatologist, Dr. Sethelle Flowers. Over time, he sought additional care from his primary care doctor, an orthopedic surgeon, a wound care center, a pain management clinic, a hand specialist, and a plastic surgeon. The rashes were initially misdiagnosed as shingles and/or lupus. Mr. Lyons saw pictures of his flank sometime in April of 2014, which showed the reddened skin with sharp demarcation lines that looked very much like a sunburn. These pictures led him to conclude that he had suffered a radiation burn. The burned area of his hand, also with a demarcation line below

---

[6] It was explained that "fluoroscopy time" is an indication of how long radiation was beamed through the device at the patient, though it is an imprecise way to determine the exact radiation dosage received by a patient. Because defendants did not appeal the jury's finding that they committed malpractice that caused Mr. Lyons's radiation burns, further discussion of this issue is not required.

[7] At trial, defendants claimed that Dr. Rigdon's records indicated that Mr. Lyons may have had a rash on his left hand and on his left flank prior to the endoleak repair. Mr. Lyons and his wife's testimonies unequivocally deny the presence of any hand or flank rashes prior to their emergence in March of 2014. Moreover, Drs. Sheahan and Hollier (and/or their staff) conducted a thorough physical examination of Mr. Lyons prior to the endoleak repair. The record of the examination was admitted into evidence. No rashes are noted anywhere, and the "upper extremities" are described as normal. Dr. Rigdon also testified that he seemed to recall that Mr. Lyons's hand rash might have been caused by a reaction to the IV used during Drs. Sheahan and Hollier's endoleak repair. Plaintiffs denied this at trial as well.

the wrist, appeared to "match up" with the burn on his flank when his hand was at his side. A biopsy of the wound sites performed in April of 2014 by Dr. Flowers was highly suggestive of a radiation injury.

Mr. Lyons's left palm and flank required debridement, which is the surgical removal of dead tissue in order to promote healing of underlying healthier tissue and/or prepare the site for a skin graft. While his flank wound eventually healed after debridement and a skin graft, the hand demonstrated an "atypical" trajectory of partial healing and then further setbacks. Two debridement procedures performed by Dr. Daneca DiPaolo, the orthopedic surgeon who treated Mr. Lyons's hand from April to July of 2014, failed to promote healthy tissue regeneration or halt the progression of deeper tissue death.

The hand wound was further complicated by the development of secondary infections in late May and June of 2014 from two different types of bacteria and mold, as detailed below. Two skin grafts, as well as a graft with an artificial skin product and further debridements, performed by Dr. Eric Wegener, a plastic surgeon, beginning in July of 2014, initially showed good healing progress, but ultimately failed to halt the progressive tissue death and extreme nerve pain. Thirty-five sessions in a hyperbaric oxygen chamber, used to promote tissue healing, did not help the wound heal. By December of 2014, Mr. Lyons's treating physicians were beginning to discuss the prospect of amputation. Ultimately, Mr. Lyons's left hand was amputated above the wrist in March of 2015.

During the months of treatment, Mr. Lyons developed an addiction to the strong narcotics (including Percocet and fentanyl patches) he was prescribed to treat his severe and intractable pain. After the amputation site healed, Mr. Lyons required medical assistance and mental health counseling to wean him off of the narcotics. During this time, he experienced depression and fear that he might harm himself, causing him to ask his wife to lock up his guns.

At the time of trial, Mr. Lyons had a prosthetic hand that he could not use with proficiency. Both he and his wife described the major changes in their lives caused by the loss of his hand. Mr. Lyons had intended to return to work at his consulting engineering job after he recovered from the endoleak repair, but the radiation injuries prevented this.[8] They had planned an active retirement with much travel and golf trips, as Mr. Lyons was a "scratch" golfer. Plaintiffs' activities have been much curtailed because of Mr. Lyons's difficulties with travel, and he can no longer golf, or hunt, another activity he previously enjoyed. Additionally, he requires his wife's assistance with activities of daily living, such as dressing.

After submission of the case to a medical review panel, plaintiffs filed suit against defendants. The matter proceeded to a jury trial on March 13-17, 2023. Following the verdict, plaintiffs filed the instant appeal. Defendants did not appeal nor answer plaintiffs' appeal.

## FIRST ASSIGNMENT OF ERROR

### *Denial of motion for a directed verdict on comparative fault*

In their first assignment of error, plaintiffs argue the trial court committed reversible error when it failed to grant their motion for a directed verdict on the issue of comparative fault.

A motion for a directed verdict is a procedural device available in jury trials for purposes of judicial economy. *Tucker v. Thornton*, 22-431 (La. App. 5 Cir. 4/26/23), 363 So.3d 1276, 1280, *reh'g denied* (5/16/23), citing *Williams v. State Farm Mut. Auto. Ins. Co.*, 20-248 (La. App. 5 Cir. 2/17/21), 314 So.3d 1010, 1021, *writ denied*, 21-0402 (La. 5/11/21), 315 So.3d 871. The motion should be granted when, after considering all of the evidence in the light and with all

---

[8] However, Mr. Lyons did not seek a lost wages claim, nor a loss of earning capacity claim against defendants.

reasonable inferences most favorable to the movant's opponent, it is clear that the facts and inferences point so overwhelmingly in favor of granting the verdict, that reasonable jurors could not arrive at a contrary result. *Id.*; *Greene v. Lovisa*, 16-660 (La. App. 5 Cir. 5/17/17), 221 So.3d 270, 276, *writ denied*, 17-1017 (La. 10/9/17), 227 So.3d 837. However, the motion should be denied and the case submitted to the jury, if evidence is produced in opposition to the motion that has such quality and weight that reasonable and fair-minded persons, exercising impartial judgment, might reach different conclusions. *Id.*

The trial court has great discretion in determining whether a directed verdict should be granted. *Baudy v. Travelers Indem. Co. of Connecticut*, 13-832 (La. App. 5 Cir. 4/9/14), 140 So.3d 125, 131. The standard of review for the appellate court is whether, viewing the evidence submitted, reasonable persons could not reach a contrary result. *Id.* Moreover, the propriety of a directed verdict must be evaluated in light of the substantive law related to the claims. *Id.*

The substantive law at issue in this particular assignment of error regards the attribution of comparative fault. La. C.C. art. 2323(A) states, in pertinent part:

> In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, … . If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.

The fundamental purpose of Louisiana's comparative fault scheme is to ensure that each tortfeasor is responsible only for that portion of the damage he has caused. *Dumas v. State ex rel. Dep't of Culture, Recreation & Tourism*, 02-0563 (La. 10/15/02), 828 So.2d 530, 538. The comparative fault regime applies to liability based on medical malpractice. *Miller v. LAMMICO*, 07-1352 (La. 1/16/08), 973 So.2d 693, 705.

Plaintiffs moved for a directed verdict at the close of the defense's case, arguing that defendants failed to put on any evidence of Mr. Lyons's negligence causing the amputation of his hand.[9] The trial court denied plaintiffs' motion for a directed verdict after a short argument by both counsel. After thorough review of this voluminous record, we conclude the trial court abused its discretion in denying the motion for a directed verdict.

The application of La. C.C. art. 2323 to reduce a plaintiff's recovery requires evidence that "[the plaintiff] suffers injury, death, or loss as the result partly of his own negligence … ." The narrow focus of the inquiry, therefore, is whether defendants presented evidence that Mr. Lyons's conduct was negligent, and if so, whether that conduct (in part) caused his loss.

It is undisputed that Mr. Lyons's conduct did not cause the radiation burns. He had no control over the placement of his body during the surgery, or the time it took to perform the procedure, which were the combined causes of his radiation burns.[10] From the defense mounted at trial, Mr. Lyons's alleged negligence (comparative fault) consisted of his post-surgical conduct of conducting "farming activities," including allegedly handling manure and fertilizer, against the instructions of his treating physicians. These "farming activities" allegedly

---

[9] At the close of plaintiffs' case, defendants moved for a directed verdict on the issue of the injury to Mr. Lyons's flank. The trial court denied the motion. This ruling has not been appealed.

[10] It was undisputed that it was not necessary for Mr. Lyons's hand to be in the radiation field for the procedure, although defendants testified that the position they used—with the hands at the sides of the body—is common and made it easier for the fluoroscopy arm to move freely around the table, as well as minimized the chance for nerve injuries that can be caused by certain other arm positions during this surgery.

Both plaintiffs' and defendants' expert radiologists testified Mr. Lyons's radiation burns from the fluoroscopy were a very rare occurrence. Only one of them, Dr. Mark L. Keldahl, plaintiffs' expert in radiology, had ever seen a patient suffer a radiation burn, and that burn was superficial and healed without strong medical intervention. Indeed, Dr. Keldahl testified that because they are so rare in a medical setting such as this one, radiation burns are often initially misdiagnosed as some other disease process, which is exactly what happened in this case. Mr. Lyons's treating physicians did not recognize the radiation burns for what they were until late April/early May when the results of the biopsy taken by Dr. Flowers reported possible radiation damage.

contaminated his hand wound with bacteria and mold, which compromised his healing and ultimately led to its amputation. In their appellate brief to this Court, defendants conclude that Mr. Lyons's negligence consisted of "repeatedly tending to his farm" and "doing too much."[11]

Plaintiffs presented a substantial amount of factual evidence through their own testimonies, as well as expert evidence from Mr. Lyons's multiple treating physicians: Dr. Sethelle Flowers (dermatology), Dr. Daneca DiPaolo (orthopedic surgeon), Dr. Eric Wegener (plastic surgeon), and Dr. Aubrey Lucas (hand surgeon). In addition, medical records were introduced from the doctors treating Mr. Lyons at the pain management center and the wound care center. Plaintiffs also presented medical expert testimony regarding radiation injuries from Dr. Mark L. Keldahl. Relevant to the issue of Mr. Lyons's alleged negligent conduct, defendants presented expert testimony from Dr. Christopher Blais, an infectious disease specialist from Ochsner Hospital.

Dr. Sethelle Flowers is a board-certified dermatologist who treated Mr. Lyons both prior to and during his radiation injury. Her treatment of Mr. Lyons coincided with his treatment with Dr. DiPaolo. Her medical records were entered into evidence. At first, Dr. Flowers thought Mr. Lyons had an irritant dermatitis, which she treated with antibiotics and topical steroids. She saw him again on April 10, 2014, after a debridement by Dr. DiPaolo. She noted that his entire left palm and wrist was denuded; that is, the epidermis had been removed, but was clean and without evidence of infection. She took biopsies of the wounds. The results were suggestive of radiation injury, whereupon Mr. Lyons confirmed that

---

[11] In brief, defendants asserted: "Mr. Lyons, on the other hand, repeatedly tended to his farm without asking his doctors if these activities could be detrimental to his healing. More than once, he jeopardized his recovery, and he documented in his diary his concerns that he was doing "too much." … "After juxtaposing the conduct of Dr. Hollier and Dr. Sheahan against the conduct of Mr. Lyons, the jury reached a reasonable verdict. The jury found that Mr. Lyons was, in fact, doing too much. Because the jury's award of general damages has ample support in the record, this Court should not disturb this award, or any others, on appeal."

he had undergone the endoleak repair with fluoroscopy. Dr. Flowers referred Mr. Lyons to Dr. Aubrey Lucas, a hand specialist, for management.

Dr. Flowers stated that development of a secondary infection following an open wound was something she saw frequently, and could occur even when a patient "does everything he is instructed to do." She last saw Mr. Lyons in March of 2015, shortly before his hand was amputated. She found him to be a compliant patient who was doing everything in his power to save his hand.

On cross-examination, Dr. Flowers was told by defense counsel that Mr. Lyons "lived and worked on a farm." She agreed that if Mr. Lyons were handling things like fertilizer and chemicals, she would have told him to avoid those things because of the potential for infection.

Dr. Daneca DiPaolo is an orthopedic surgeon who treated Mr. Lyons from March 11, 2014 until July of 2014, when she referred him to Dr. Erik Wegener, a plastic surgeon, to perform skin grafts on Mr. Lyons's hand because this is a procedure she did not perform. It was during Dr. DiPaolo's treatment of Mr. Lyons that he contracted infections in his hand with *pseudomonas aeruginosa* and the MRSA *Staphylococcus aureus*, and an unspecified mold, which are the infections defendants identify as being contracted by Mr. Lyons's negligence and causative of his amputation.[12] Dr. DiPaolo agreed that she advised Mr. Lyons to use his hand as much as he could, and that she had given him permission to drive if he were careful. Dr. DiPaolo was clear that infection was always a danger with such an open wound as large as Mr. Lyons's. She described *Staphylococcus aureus* as living on our skin, and *pseudomonas aeruginosa* as being present and prevalent in our environment, even in our noses, and she agreed that *pseudomonas aeruginosa* could be found in soil and dirt. She testified that Mr. Lyons's hand

_____

[12] These infections were treated at that time with aggressive antibiotic therapy and had been resolved well prior to the time of the amputation in March of 2015.

could have easily become infected through the activities of normal daily living, such as toileting. She was puzzled about the presence of the mold infection, because mold usually colonizes on tissue that is already dead.

On cross-examination, Dr. DiPaolo was told that Mr. Lyons was a farmer, which she did not know. She would not have advised him to perform "farming activities" had she known, because this could have led to infection. Mr. Lyons's own testimony, however, which is detailed below, was clear that he was not a farmer.

Dr. Erik Wegener was the board-certified plastic surgeon who performed skin grafts on Mr. Lyons's hand after being referred by Dr. DiPaolo. Over the years of his practice, Dr. Wegener had seen between eighty and one hundred radiation burns, though most of them were not on the extremities. Radiation burns are noted for their "delayed declaration" or presentation, which means that the damage and tissue death manifests over time, not all at once or at the time the burn is sustained.

Dr. Wegener first saw Mr. Lyons on July 16, 2014, in conjunction with Dr. Lucas. At that time, Mr. Lyons had no infection, but the wound was covered with necrotic (dead or dying) skin. In his first surgery on Mr. Lyons on July 23, 2014, Dr. Wegener shaved down the necrotic skin and covered the wound with Integra, a skin substitute used in burn wounds to get a clean, closed, and sealed wound. Mr. Lyons was placed in a splint following this surgery that allowed his fingers to move, but not his wrist and hand. One week after this surgery, Mr. Lyons reported that his pain was significantly reduced and he had a good range of motion in his fingers, though decreased from a normal range. On August 12, 2014, examination showed that some of the Integra had good incorporation, which means that blood vessels would grow in the Integra and "be alive" as part of his skin, but some areas did not. The areas that were not incorporated were cut away.

Mr. Lyons returned on August 19, 2014, and examination showed that the Integra was not incorporating, although Mr. Lyons had no signs of infection.[13] Dr. Wegener felt that the graft had failed because damage to the surrounding tissues and blood vessels was preventing an appropriate blood flow into the area, which he blamed on the delayed presentation of the radiation damage. In his next surgery on August 20, 2014, Dr. Wegener cut dead tissue away all the way down to Mr. Lyons's transverse ligament, and harvested a skin graft from his forearm. Once again, a week post-operatively, Mr. Lyons's pain was improved, and there were no signs of infection. On September 2, 2014, Dr. Wegener's examination led him to believe that the skin graft was going to "100% take." However, Mr. Lyons's range of motion was diminished at that point, and Dr. Wegener did not allow him to move his wrist so that the graft would not fall off. Once again, there was no sign of infection.

It was Dr. Wegener who suggested that Mr. Lyons use a hyperbaric oxygen chamber, because his wound was not getting better. On September 16, 2014, it appeared that the graft was not, in fact, going to take, though there were no signs of infection. Dr. Wegener attributed the failure of the graft to ongoing tissue death from the radiation. He saw Mr. Lyons again in December of 2014, after Mr. Lyons had been using the hyperbaric oxygen chamber. He noted that the flank wound was full thickness, as was the hand wound, but with no sign of infection. He also had no motion in his digits, but experienced some wrist motion. By this time, Mr. Lyons had lost most of the use of his hand, and would not recover it. At this point, amputation entered into the discussions.

---

[13] Mr. Lyons's diary shows that on or about August 17, 2014, he related running his bush hog for approximately two hours. He does not report lifting anything or spreading fertilizer.

Dr. Wegener attributed the amputation to the radiation injury. He firmly stated that the infection did not cause the need for the amputation.

On cross-examination, Dr. Wegener stated that most of the time skin grafts will "take" if you have a viable tissue bed upon which to graft. He explained that it was absolutely "routine" for a skin graft to not take in a case like Mr. Lyons's. He said that Mr. Lyons could not remove the splint placed on his hand after the July Integra graft.

Dr. Wegener had approved Mr. Lyons to return to "ultra-light duty" work after September 15, 2014, which meant not picking up heavy objects, or turning wrenches or screws with his left hand. Mr. Lyons was allowed, however, to bathe, eat, change clothes, put gas in his car, cook and clean up in the kitchen, and the more of these activities, the better for his hand's function. Dr. Wegener agreed that it was important to keep the wound clean. Mr. Lyons's diary reports that he returned to work 30 hours per week from home.

Defense counsel told Dr. Wegener that "during the relevant time period," Mr. Lyons "lived and worked on a farm" and would "handl[e] chemicals and fertilizers on a regular basis." Dr. Wegener agreed he would caution patients not to get filth or manure in a wound, but he wanted Mr. Lyons to move his hand, the more the better.

### Behavior of a radiation skin injury

Dr. Mark L. Keldahl was qualified as expert in vascular surgery and wound care.[14] In his opinion, the radiation-induced injuries resulted in the need to amputate Mr. Lyons's hand. Dr. Keldahl explained to the jury how radiation burns differ from thermal burns, both in mechanism and development. In a

---

[14] Dr. Keldahl testified that he reviewed all of the records, the radiation images, the depositions of Drs. Hollier and Sheahan, read all the discovery materials, and saw the photos of Mr. Lyons's hand.

thermal burn, the damage to tissues is caused by contact and is sustained immediately. On the other hand, radiation burns will present weeks after the causative event, first with a rash and then with blisters. He stated that the pictures of Mr. Lyons's flank, with a clearly demarcated line, was a very classic picture of a radiation burn.

Dr. Keldahl explained that radiation does not stay on the surface (skin) of the body. It is energy that goes through a patient. It does not damage just skin cells, but also damages fat tissues and all other structures in the path of the beam. Mr. Lyons's hand was more damaged than his flank, because the hand is "thin," with little distance between the skin, muscles, tendons, and blood vessels, unlike the flank, which is thicker and has more fat. The flank eventually healed because the burn did not go "all the way down." The wounds on his hand, however, evolved and got worse, and exposed tendons, nerves, and blood vessels. He opined that the hand had too much radiation damage to "come back from."

Two articles were introduced to the jury with Dr. Keldahl's testimony. The first one was entitled, "Skin Injuries from Fluoroscopically Guided Procedures: Part 1, Characteristics of a Radiation Injury." In testifying about the article, Dr. Keldahl explained that radiation burns take an average of two weeks to "show." Common practice at his hospital is to tell the patient when he went over the radiation threshold and that the patient will need to be evaluated by a doctor within two weeks of the procedure, because burn findings are delayed. When skin desquamation is severe and protracted, dehydration and infection can easily complicate healing.[15] Dr. Keldahl could not predict whether Mr. Lyons's hand would have healed absent the infections.

---

[15] Desquamation is the shedding of the skin.

The article explained that some radiation ulcers never heal completely, but break down intermittently instead. Dr. Keldahl opined that this is what happened in Mr. Lyons's case. Based upon all of his knowledge in this field and his review of all the records, Dr. Keldahl believed that amputation of Mr. Lyons's left hand was the direct result of the radiation injury, not the infections.

Dr. Keldahl was asked to look at an article about skin injuries from ionizing radiation. The pathophysiology of radiation burns differs from thermal burns in major ways. Radiation burns are associated with opiate-resistant chronic pain, which Mr. Lyons experienced. The most complicating factor of radiation burns is the unpredictable successive inflammatory waves occurring weeks to years after radiation exposure. Conventional treatment for severe radiation burns combines surgical excision of damaged tissue and reconstructive surgery, such as full-thickness skin grafts. However, Dr. Keldahl believed that successive inflammatory waves often lead to impairment and necrosis of the newly grafted skin. Therefore, the majority of severe radiation burns require successive surgical excisions and reconstructions, as well as amputation. Overall, the healing of radiation burns is extensive and unpredictable.

Other risk factors for severe radiation skin injury are increased transepidermal water loss and infiltration of pathogens or bacteria into the skin. The article explained that severe radiation dermatitis for localized radiation has previously been linked to *Staphylococcus aureus* infection, which is what happened in this case. Host antimicrobial defenses are severely compromised by radiation and/or skin trauma combined with radiation. Even mice exposed to sublethal total body radiation have increased susceptibility to infection. Importantly, Dr. Keldahl did not see any evidence in the records where Mr. Lyons acted improperly in caring for his wound.

### Evidence of "Farming Activities"

Throughout the trial, defendants portrayed Mr. Lyons as a "farmer" who performed "farming activities," such as tending livestock, and handling manure and fertilizer, either against the specific instructions of his treating physicians, or who failed to tell his physicians what he was doing.[16] These "farming activities" caused Mr. Lyons's hand to become infected, defendants posited, which otherwise would not have happened, and these infections led to reversal of the healing progress and ultimately to the amputation of his hand, they theorized. The evidence at trial, however, does not bear out that theory.

Mr. Lyons testified at trial. He characterized their property as a "country place." At the relevant times while his radiation injury manifested and developed from March of 2014 to March of 2015, Mr. Lyons grew some palm trees; he had no livestock of any kind, and the only animal they had was a dog.[17] Mr. Lyons said that he had gotten permission from Dr. DiPaolo, his orthopedic surgeon, to drive carefully. He had also been advised by her and Dr. Wegener to use his hand as much as possible in order to preserve function.[18] He admitted to driving his tractor with a bush hog to cut the grass on the property. He described the tractor as "immaculate," having a fully enclosed cab with heating and air conditioning. He also used the equipment to spread fertilizer. He testified that on a couple of occasions during his treatment with Dr. DiPaolo, he picked up a couple of 50-pound sacks of fertilizer, using mostly his good (right) arm, and loaded them into

---

[16] Defendants made this portrayal on their cross-examinations of plaintiffs' witnesses, as well as to their own expert, Dr. Blais.

[17] Plaintiffs testified that they had no other animals on their property until after Mr. Lyons's hand was amputated, when they got some cows to "give him something to do," since he could no longer do many of the activities he used to be able to do.

[18] In their testimonies, both Drs. DiPaolo and Dr. Wegener confirmed their instructions to Mr. Lyons to use his hand as much as he could.

a hopper attached to the tractor in order to spread it on the ground.[19] He did not spread fertilizer every day or very often. Mr. Lyons never described this fertilizer as manure, and there is no direct evidence in the record from him that he, at any relevant time, handled manure, animal waste, or dirt and soil. It does not appear that he lifted these sacks after the skin grafts were performed by Dr. Wegener.

Mr. Lyons's diary of this time period was entered into evidence. From March 11th until the time his hand was amputated, Mr. Lyons experienced extreme pain in his hand and flank, which he described in his diary as never being below a five on a ten-point scale. Often, he described the pain in his hand as extreme or excruciating, "10 out of 10." During this time, Mr. Lyons had two debridements with Dr. DiPaolo, which were very painful surgeries, where the dead tissue was removed to promote the healing of the underlying tissue. During the time he treated with Dr. DiPaolo, Mr. Lyons was having two to three doctors' appointments per week on average, seeing not only Dr. DiPaolo for surgeries and follow ups, but also the wound care center, the pain management doctors, and some physical therapy. The cumulative observation from Mr. Lyons's diary and his medical records is that his schedule was consumed with medical visits and several surgical interventions to diagnose and treat his hand, to tend the wound, and to treat his intractable pain on both his hand and his flank. At this time, Mr. Lyons did not return to work as expected, not only because his time was consumed by medical visits, but he was physically unable to work. His diary records that on many nights, he was unable to sleep because of the extreme pain, and that he was required to take narcotic pain medication around the clock, that was never fully effective, to manage the pain.

---

[19] In this instance, the relevant time period is late April and May of 2014, when Mr. Lyons's hand became infected.

The diary and Mr. and Mrs. Lyons's testimonies show Mr. Lyons to have been a man who enjoyed working, and enjoyed being physically active, particularly outdoors.[20] He previously enjoyed maintaining his property. He was also a scratch golfer and enjoyed some hunting from time to time. His diary reveals that on several occasions during his treatment with Dr. DiPaolo, Mr. Lyons had a few days where his hand was doing well and his pain was less, which led him to get outside and work on his property. Mr. Lyons did not have many opportunities to drive his tractor or spread fertilizer, due to his medical complications and many doctors' appointments, but did do so on a very few occasions when his hand was not as painful. At all times, his hand was heavily bandaged, because the skin on the entire palmar surface of his hand was affected and was often an open wound. His wound care was performed by his wife, who testified that she followed doctors' instructions regarding cleanliness and sterile glove-wearing.[21] It is clear from the diary, testimonies, and medical records, that even when the pain was only a 5 out of 10, Mr. Lyons's left hand was not a true fully functional hand due to the pain, the bandages, and the impaired mobility caused by both.

Defendants' expert, Dr. Christopher Blais, was qualified as an expert in infectious diseases and wound care. He was told Mr. Lyons was a farmer. He did not meet Mr. Lyons in person. He was asked to review Mr. Lyons's records and comment on the infections he had developed during the treatment of his hand.[22]

---

[20] Until his hand became injured, Mr. Lyons seldom missed going to work. He was still on sick leave when his hand injury manifested. According to his diary, Mr. Lyons intended to return to work after the endoleak repair, but was unable to do so due to his hand and all the attendant medical complications, pain, and time-consuming medical care.

[21] The jury implicitly found that Mrs. Lyons was not negligent in her wound care. They awarded her $100,000 for loss of consortium damages, which was the single largest award the jury made in this case.

[22] Dr. Blais issued his report on October 28, 2021. He made the report before he had reviewed several doctors' records, but did not change his report after he reviewed the additional medical records. He did not review the medical records and depositions of any treating physicians after Dr. DiPaolo (who ceased treating Mr. Lyons in July of 2014) and thus they did

Dr. Blais noted that Mr. Lyons would go through periods of healing, then twice had a setback with an infection of some kind. Dr. DiPaolo's records indicated she got debridement to a layer of skin with good blood supply, and fully healed by April, into early May.[23] He saw no infection noted in the medical records until end of May or early June. He noted from Dr. DiPaolo's records that Mr. Lyons "lived and worked on a farm" and was exposed to herbicides, fertilizers, and manure, which he said was a recipe for disaster with an open wound. Dr. Blais noted that: "We see them [bacterial infections] a lot, particularly in hospital settings."

Dr. Blais said that any time one has an open wound, it can get infected. He believed that if the wound was in contact with the "farm environment," it could increase chances of getting an infection. He opined that the "nonhealing" of the hand wound would more likely than not be made worse by the infections.

When Dr. Blais was told Mr. Lyons was a farmer, he thought this meant Mr. Lyons was an active farmer taking care of livestock, etc. He referenced Mr. Lyons's deposition, where he claimed that Mr. Lyons admitted that he handled manure, putting it in a hopper to distribute on his farm, in May of 2014. (The deposition is not in evidence.) He did not know that Mr. Lyons did not own any livestock or animals, was not growing crops, and was not handling manure. Dr. Blais posited that, because the wound on Mr. Lyons's hand cultured with "*pseudomonas*, methicillin-resistant *Staphylococcus aureus*, and an unidentified mold," "the patient, more likely than not, acquired those repeated infections from

---

not form the basis of his opinion in his report. Notably, he did not look at Mrs. Lyons's deposition, nor Dr. Flowers's deposition. He did not review Dr. Lucas's deposition, who was the hand specialist who cared for Mr. Lyons after Dr. DiPaolo. He did not look at Dr. Wegener's deposition, the plastic surgeon who treated Mr. Lyons for almost a year, right up to the amputation.

[23] In fact, Dr. DiPaolo's records and her testimony clearly state that while Mr. Lyons's hand was making progress healing, the healing behavior was "atypical" and Mr. Lyons's hand did not fully heal at any time during his treatment with her.

exposure while working on a farm," since these organisms can be associated with farming and exposure to the environment. Dr. Blais further speculated that, "[i]f Mr. Lyons continued to work in farming during this time, [he] would strongly suspect that exposure to farming (manure, fertilizer, water, etc.) would be the most likely source of these infections."

Yet, Dr. Blais acknowledged that he did not know what "high-density livestock operations" were, much less whether Mr. Lyons maintained a high-density livestock operation, and he had no direct evidence that Mr. Lyons handled, exported, or transported manure in any way.[24]

Dr. Blais acknowledged saying in his deposition that people are exposed to *staph*, *pseudomonas*, and mold every day. He had no evidence that Mr. Lyons's hand was not kept properly clean, dry, and bandaged. Dr. Blais agreed that no medical records from the doctors who treated Mr. Lyons after Dr. DiPaolo through the amputation, say that there was any infection of his hand after she treated him.

Dr. Blais agreed to the following scenario. Mr. Lyons got a radiation burn. It led to an open wound, which then got secondarily infected, which was *possible* even if Mr. Lyons did everything he was supposed to do. He agreed that he has treated people in hospitals every day where doctors and nurses are taking care of wounds, changing bandages, and the wounds sometimes still get infected, and sometimes those infections are very serious and cannot be cured.[25]

Upon review, we conclude that the entire basis of Dr. Blais's opinion regarding Mr. Lyons's negligent conduct was based upon the false premise that

---

[24] Defendants introduced an article into evidence detailing "high density livestock" operations.

[25] On redirect, however, Dr. Blais maintained his opinion that the endoleak surgery did not cause the infections, and that the infections led to the decline of Mr. Lyons's health and ultimately the amputation.

Mr. Lyons was a farmer, who regularly engaged with livestock, chemicals, and manure. His report was based not only upon this false premise given to him by defense counsel, but also upon incomplete medical records, as he did not review any treating physicians' reports after Dr. DiPaolo. As a result, the veracity of Dr. Blais's report, and the "quality and weight" of his evidence, was thoroughly diminished. Furthermore, Dr. Blais's opinion that Mr. Lyons's infections were more likely than not caused by his negligent "farming" conduct was impeached on cross-examination, as he was confronted with the fact that Mr. Lyons was not a farmer who was engaged in the activities that formed the basis of his expert opinion. Further, on cross-examination, Dr. Blais recounted his own professional experiences seeing wounds cared for by doctors in hospitals become infected despite the lack of patient negligent conduct. He conceded that infection of Mr. Lyons's hand was possible even if he was not negligent.

We have viewed all of the very graphic photographs of Mr. Lyons's hand, taken regularly as his injury progressed in severity, as did the jury. It beggars our collective imaginations that defendants could claim Mr. Lyons was at any time performing "farming activities" consisting of tending crops and cleaning up after livestock with a disabled left hand that had such a large, full-skin thickness, extremely painful wound that was fully covered in bandages or a wrist brace on each occasion in May of 2014 that Mr. Lyons was driving his tractor or bush hog, or the few times that he was loading chemical fertilizer into a hopper.

There is no evidence in the record that Mr. Lyons was a "farmer" or performed "farming activities" as described by defense counsel in their cross-examination of Mr. Lyons's treating doctors (Drs. Flowers, DiPaolo, and Wegener) or Dr. Blais. Mr. Lyons never had livestock before his hand was amputated, let alone a "high density livestock" operation as described by Dr. Blais. There is no testimony or evidence that driving an air-conditioned tractor on

his property violated his doctors' orders or was any riskier for infection than driving his automobile on the public streets, which Dr. DiPaolo gave him permission to do. Likewise, the only other activity deemed a "farming activity" described by Mr. Lyons was the lifting of 50-lbs sacks of fertilizer on a couple of occasions to load them, using mostly his good (right) hand, into a hopper on his tractor to spread it. There is no evidence that this fertilizer was manure, and there is no evidence that Mr. Lyons's hand became contaminated with chemical fertilizer as a result. Lifting a 50-lb sack of anything, fertilizer or something else, is not an activity specifically associated with farming as defendants portrayed it. Likewise, there is no evidence that this act was negligent on Mr. Lyons's part or was against his doctor's orders when he did it, prior to his skin grafts.

Drs. DiPaolo, Flowers, and Wegener all described Mr. Lyons as fully compliant with their instructions and who displayed every intent of trying to help his hand recover. Dr. DiPaolo, in her deposition played for the jury, expressed puzzlement and frustration by the "atypical" way his hand wound behaved. Before she understood that it was a radiation burn, she did not understand why the tissue necrosis moved deeper into his hand or why the wound would not heal. While she agreed that the infections were concerning and a setback, she believed Mr. Lyons did not contract the infections through negligence, disregard for her instructions, or carelessness. She believed his injury was caused by a "noxious event" or "stimulus" that Mr. Lyons not cause.

Thus, there is no credible evidence in the record that Mr. Lyons was a farmer engaged in "farming activities," or that the activities he occasionally engaged in, as described above, were negligent, violative of his doctors' orders, or made him more likely than not to contract infections than the normal activities of daily living.

*"Doing too much"*

Defendants argued to the jury, and to this Court in brief, that Mr. Lyons also was negligent by "doing too much" with his hand, which contributed to his amputation. Defendants took this description, "doing too much," from Mr. Lyons's own diary. On two occasions during his treatment with Dr. DiPaolo in May and June of 2014, Mr. Lyons described several "good days," where his pain level was manageable and his hand moved well (although still fully bandaged), followed by swelling and extreme pain the next day, leading Mr. Lyons to conclude that he had "done too much," which ostensibly coincided with his being active on his property driving his tractor. In this time-frame, Dr. DiPaolo cultured his hand and found the two bacterial infections.

On another occasion in August of 2014, Mr. Lyons described taking a very "bouncy" ride while bush hogging on his property, that was followed by additional pain and swelling in his hand. At this time, Mr. Lyons had no infections in his hand. Mr. Lyons again attributed the increased pain, swelling, and loss of mobility in his hand to "doing too much" on account of the "bouncy" ride. It does not appear that Mr. Lyons's hand got another infection after this "bouncy" ride. Likewise, there is no evidence that the "bouncy" ride caused Mr. Lyons's skin graft to fail to take.

The evidence is simply lacking that Mr. Lyons's allegedly "doing too much" constituted negligence. The phrase is lifted from his diary and does not correspond to any instructions or prohibitions from his doctors. Mr. Lyons was encouraged by his doctors to use his hand as much as possible. Furthermore, "doing too much" is imprecise and incapable of quantification.

Mr. Lyons's treating doctors testified that he was very susceptible to infection because his radiation burn covered a large area and compromised so much skin, which is the body's first line of defense against foreign substances.

These doctors also testified that Mr. Lyons could have contracted the infections without any negligent conduct. Dr. Blais, defendant's own expert, agreed on cross-examination that he has seen patients of his own in hospitals who contracted wound infections despite doing nothing wrong. The evidence does not preponderate that Mr. Lyons's "doing too much" was negligent conduct, violated his doctors' orders, led to his infections, or, ultimately, to his amputation.

In conclusion, it is clear that the evidence and testimonies presented by Mr. Lyons's treating physicians and expert witnesses concluded that the radiation injury was the primary cause of Mr. Lyons's amputation, not the infections in his hand. Mr. Lyons showed that he suffered injuries because of defendants' negligence that would not have otherwise occurred. Defendants failed to elicit evidence of quality and weight to support their theory that Mr. Lyons's conduct was negligent. Rather, this was only mere speculation on defendants' part. We conclude that, after considering all of the evidence in the light and with all reasonable inferences most favorable to defendants, it is clear that the facts and inferences from the evidence presented point so overwhelmingly in favor of granting the verdict in favor of plaintiffs, reasonable jurors could not arrive at a contrary result. Accordingly, the trial court abused its discretion in denying plaintiffs' motion for a directed verdict on the issue of comparative fault.

## SECOND ASSIGNMENT OF ERROR

### *Allocation of comparative fault*

Plaintiffs next argue alternatively that the jury's verdict allocating fault and awarding damages was clearly wrong and manifestly erroneous because defendants/appellees failed to prove by a preponderance of evidence the affirmative defense of comparative fault.

Because we have found error in the trial court's denial of plaintiffs' motion for a directed verdict on the issue of comparative fault, it is unnecessary for us to reach this assignment of error.

### THIRD ASSIGNMENT OF ERROR

#### *Damages*

Within this assignment, plaintiffs argue the jury's special and general damage awards were an abuse of discretion because they go against the weight of the evidence presented at trial. Specifically, plaintiffs argue that because the jury apportioned some fault to defendants, it was legal error for them to not award Mr. Lyons his full damages for past medical expenses (subject to reduction by his percentage of comparative fault, which is now moot). They further appeal the jury's failure to award Mr. Lyons any damages for future medical expenses. They argue that the jury's failure to award Mr. Lyons any damages for permanent disability was manifestly erroneous. They further argue that the specific awards for loss of enjoyment of life, past pain and suffering, and future pain and suffering are grossly and abusively inadequate.[26]

Compensatory damages are designed to restore the plaintiff to the state he would have been in, but for the tort. *Perry v. Starr Indem. & Liab. Co.*, 52,720 (La. App. 2 Cir. 9/25/19), 280 So.3d 813, 820. Compensatory damages are classified as either "special" or "general." *Id.* "Special damages" are those which have a ready market value, *i.e.*, their value can be determined with relative certainty. *Id.* These damages include past medical expenses and future medical expenses. A jury's decision regarding special damages is subject to manifest error

---

[26] The jury awarded the following damages: $30,000 for Mr. Lyons's physical pain and suffering; $30,000 for Mr. Lyons's mental pain and suffering; $0 for Mr. Lyons's permanent disability; $42,000 for Mr. Lyons's past medical expenses; $0 for Mr. Lyons's future medical expenses; $50,000 for Mr. Lyons's loss of enjoyment of life; and $100,000 for Mrs. Lyons's loss of consortium, which were all reduced by 75% as a result of Mr. Lyons's comparative fault. That reduction was eliminated by our conclusions in the first assignment of error.

review.  This standard only allows an appellate court to adjust a damages award where: (1) there is no reasonable factual basis for the jury's decision; and (2) the decision is clearly wrong.  *Id.*

### *Special Damages – Past medical expenses*

Plaintiffs argue the jury erred as a matter of law when, having assigned some percentage of fault to defendants, they failed to award Mr. Lyons his full past medical expenses.  Defendants argue in brief that the jury must have concluded that for the first two months after his injury, Mr. Lyons's medical expenses were due to the conduct of defendants, but after that point, which is when Mr. Lyons's hand first became infected, the jury must have concluded that his medical expenses were no longer "solely" attributable to his radiation, but instead, were more related to the "infections that he contracted from his farming activities."  This assignment of error has merit, as a result of our elimination of Mr. Lyons's comparative fault, but also independently, in the event this Court had maintained the finding of comparative fault.

When a plaintiff alleges that medical expenses were incurred "and that allegation is supported by a bill, unless there is sufficient contradictory evidence or reasonable suspicion that the bill is unrelated to the accident, it is sufficient to support the inclusion of that item in the judgment."  *Goutro v. Sullivan*, 07-1430 (La. App. 3 Cir. 5/7/08), 986 So.2d 673, 680, *writ denied*, 08-2139 (La. 11/10/08), 996 So.2d 1077, citing *Este' v. State Farm Insurance Co.*, 96-99 (La. App. 3 Cir. 7/10/96), 676 So.2d 850, 857.  A factfinder errs if it fails to award the full amount of medical expenses incurred as a result of the accident and proven by a preponderance of the evidence.  *Id.*, citing *Revel v. Snow*, 95-462 (La. App. 3 Cir. 11/2/95), 664 So.2d 655, *writ denied*, 95-2820 (La. 2/2/96), 666 So.2d 1084.  *See also Seagers v. Pailet*, 95-52 (La. App. 5 Cir. 5/10/95), 656 So.2d 700, 711.  This

rule is applicable unless the plaintiff has incurred medical expenses in bad faith. *Sumrall v. Sumrall*, 612 So.2d 1010 (La. App. 2 Cir. 1993).

The past medical expenses submitted into evidence by plaintiffs totaled $704,218.68. These expenses reflected all of the medical treatment Mr. Lyons incurred beginning with the first display of the itchy rash on his hand and flank, and included all subsequent treatment by the many doctors who treated Mr. Lyons's hand and flank from the beginning of the manifestation of the injuries to the amputation of Mr. Lyons's hand in March of 2015 and his recovery from that surgery. There is no evidence that Mr. Lyons incurred any medical treatment in bad faith. With this Court's elimination of Mr. Lyons's comparative fault, he is entitled to an award of his full past medical expenses. Accordingly, we amend the past medical expenses award to award plaintiffs the full amount of Mr. Lyons's past medical expenses in the amount of $704,218.68.[27]

### *Special Damages – Future medical expenses*

Future medical expenses, as special damages, must be established with some degree of certainty, and a plaintiff must demonstrate that such expenditures will, more probably than not, be incurred as a result of the injury. *D'Ambrosia v. Lang*, 07-298 (La. App. 5 Cir. 4/29/08), 985 So.2d 800, 814. The cost of future

---

[27] It is important to state, however, that had this Court not reversed the denial of plaintiffs' motion for a directed verdict, and had this Court on appeal maintained a finding that Mr. Lyons bore some comparative fault, the jury nonetheless erred as a matter of law in failing to award plaintiffs *the full amount* of past medical expenses, thereafter reduced by his comparative fault.

The jury's limitation of the past medical damage award to only those expenses incurred prior to the first bacterial infection in late May/early June of 2014 is not consistent with their finding that but for defendants' malpractice, Mr. Lyons's injury would not have occurred, through their assignment of fault to defendants. *See Goutro v. Sullivan*, 986 So.2d at 680 (in a case where the jury assigned some comparative fault to the plaintiff, nonetheless because the jury clearly believed that the knee injury was related to the accident, it was error for the jury to fail to award the plaintiff the full amount of past medical expenses incurred as a result of the accident and proven by a preponderance of the evidence.) Therefore, *the partial award* of past medical expenses, prior to reduction for comparative fault, is not supported by the law, and apparently, actually functioned as a second reduction not supported by the law. Accordingly, it was clear error and an abuse of discretion for the jury to limit Mr. Lyons's past medical expenses damages to only those expenses incurred prior to the infection of Mr. Lyons's hand.

medical treatment and expenses cannot be precisely measured; however, the plaintiff must still establish future medical expenses with some degree of certainty through medical testimony that such expenses are indicated and their probable cost. *Buckheister v. U.S. Env't Servs., L.L.C.*, 11-1148 (La. App. 5 Cir. 5/31/12), 97 So.3d 414, 421, *writ denied*, 12-1462 (La. 10/8/12), 98 So.3d 861.

The jury awarded plaintiffs nothing for future medical expenses. We conclude the jury's conclusion was manifestly erroneous. The evidence at trial is clear that, but for the radiation burn, Mr. Lyons would not have lost his hand, intervening infections or not. Mr. Lyons also proved by a preponderance of the evidence that he will have some future medical expenses related to his prosthetic hand.

Plaintiffs introduced into evidence a life care plan by a certified rehabilitation counselor and certified life care planner, David Stewart. Mr. Stewart first drew up the plan in 2021 and updated it for trial. He relied upon four professional resource manuals and also consulted with Dr. Hines, Mr. Lyons's primary care doctor. He reviewed Mr. Lyons's medical records and spoke to Mr. Lyons himself.[28] This plan called for three different prosthetic hands every five years (for a total of six prostheses), each tailored to different functions. The plan also listed expenses for the prostheses themselves, fittings, and instructional therapy on how to fully use each hand. The life care plan also included expenses for mental health counseling. The total amount requested by plaintiffs for future medical expenses was $469,737.43.

While the evidence supports an award for future medical expenses, the amount requested by plaintiffs' life care plan was not supported by the evidence. Mr. Lyons was around 67 years old when his hand was amputated. He was 75 at

---

[28] Mr. Stewart also reviewed defendants' expert witness reports.

the time of trial. He and his wife testified that he had had two prosthetic hands. The first one was hard for him to use, perhaps because he did not receive adequate occupational therapy and instruction on how to use it. Before trial, Mr. Lyons had received a new prosthesis that was proving easier for him to use, but nonetheless he testified that he did not wear it all of the time. There was no testimony from plaintiffs to support their expert's life care plan for three different types of specialized prostheses, and all of the training and mental health counseling associated therewith.

Rather, the record supports a conclusion that Mr. Lyons will more likely than not require a new "activities of daily living" prosthesis, and two replacements thereof, during his life expectancy post-trial (11 years, or until 2033), as he has already had two prostheses since the amputation. For guidance, we turn to plaintiffs' expert's original and updated life care plans and Mr. Lyons's own testimony regarding his needs and the use of his current prosthesis. We find that a reasonable award for those and associated occupational therapy is $395,775.00. This figure was reached after consulting both plaintiffs' expert's original and updated life care plans, and defense exhibit 23, the report of their expert economist.[29] We have averaged the "Projected Therapeutic Modalities" (occupational therapy) found on p. 2 of the updated report to reach the amount of $11,350.00, to which we have added the minimum amount for Projected Occupational Therapy Evaluation ($498.00), and the projected cost found in the updated report for the "Activities of Daily Living" prosthesis (and two replacements thereof) in the amount of $383,927.00, to reach a total of

---

[29] Defendants' expert's report gave a "low" estimate for a single prosthesis of $246,963.85, and a "high" estimate of $457,452.15.

$395,775.00.[30] We accordingly hereby amend the damage award to include this amount ($395,775.00) for Mr. Lyons's future medical expenses.

***General Damages***

General damages are those which may not be fixed with pecuniary exactitude; instead, they involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or lifestyle which cannot be definitely measured in monetary terms. *Buckheister v. U.S. Env't Servs., L.L.C.*, 97 So.3d at 422. Plaintiffs appeal the particular general damage awards made by the jury. Specifically, plaintiffs argue that the awards for Mr. Lyons's physical pain and suffering ($30,000), mental pain and suffering ($30,000), permanent disability ($0), and loss of enjoyment of life ($50,000) are abusively low. We agree.

Our Supreme Court, in *Pete v. Boland Marine & Mfg. Co.*, LLC, 23-00170 (La. 10/20/23), 379 So.3d 636, 638-39, *reh'g denied*, 23-00170 (La. 12/7/23), 374 So.3d 135, recently revised the method by which appellate courts are to review general damage awards and how they determine whether the trier of fact's award was an abuse of discretion, to wit:

> Our jurisprudence has a long-standing general principle, most recently reiterated by this Court in *Jones v. Mkt. Basket Stores, Inc.*, 22-00841, p. 16 (La. 3/17/23), 359 So.3d 452, 464 (citation omitted), that, in reviewing a general damage award, the "initial inquiry ... is whether the trier of fact abused its discretion in assessing the amount of damages." Thereafter, and only when a determination has been made that the "trier of fact has abused its 'much discretion,'" will a court "resort to prior awards ... and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion." *Id.*

> We have carefully considered whether it remains a sound practice to allow consideration of prior awards only after finding an "abuse of discretion," or whether those awards are a relevant factor to be considered in determining whether there has been an abuse of discretion at the outset. There are no specific parameters by which an "abuse of discretion" is measured, nor a meaningful definition of this

---

[30] These costs included the socket, supplies, and maintenance on the prostheses.

phrase. Such determinations are not subject to mathematical exactitude or scientific precision. Indeed, as this Court has recognized, "[t]he standard for appellate review for abuse of discretion in the award of general damages is difficult to express and is necessarily non-specific." *Cone v. Nat'l Emergency Servs., Inc.*, 99-0934, p. 8 (La. 10/29/99), 747 So.2d 1085, 1089 (citing *Youn v. Mar. Overseas Corp.*, 623 So.2d 1257, 1261 (La. 1993)).

The inherently subjective nature of the abuse of discretion standard in the context of reviewing general damage awards compels that some measure of objectivity be incorporated into the determination of an award's reasonableness, so that there is some standard for comparison. We now hold that an appellate court must consider relevant prior general damage awards as guidance in determining whether a trier of fact's award is an abuse of discretion.

The court stated that the question of whether the trier of fact abused its discretion in assessing the amount of damages remains the initial inquiry. However, to evaluate this issue, an appellate court is to include a consideration of prior awards in similar cases, as well as the particular facts and circumstances of the case under review. If an abuse of discretion is found, the court is to then also consider those prior awards to determine "the highest or lowest point which is reasonably within that discretion." *Id.* at 644.

In awarding damages, the injury sustained is not the sole factor for the determination of damages. *In re Boryca*, 20-0670 (La. App. 4 Cir. 8/11/21), 366 So.3d 110, 118, *writ denied sub nom. In re Med. Rev. Panel Proc. of Boryca*, 21-01832 (La. 2/15/22), 332 So.3d 1180, and *writ denied sub nom. In re Med. Rev. Panel Proc. of Boryca*, 21-01892 (La. 2/15/22), 332 So.3d 1181, and *writ denied sub nom. In re Med. Rev. Panel Proc. of Boryca*, 21-01825 (La. 2/15/22). Rather, factors such as mental and physical pain and permanent disabilities must be considered in the determination of whether the trier of fact abused their discretion. *Id.*

An appellate court may not overturn an award for general damages unless it is so out of proportion to the injury that it shocks the conscience. *Latulippe v. Braun*, 18-83 (La. App. 5 Cir. 8/10/18), 253 So.3d 820, 834.

General and special damages may be awarded *in globo*. *Johnson v. Philip,* 20-262 (La. App. 5 Cir. 3/17/21), 316 So.3d 144, 152, *writ denied*, 21-00530 (La. 6/22/21), 318 So.3d 707, and *writ denied*, 21-00576 (La. 6/22/21), 318 So.3d 709.

***Pain and suffering; loss of enjoyment of life; permanent disability***

The jury awarded Mr. Lyons a total of $60,000 for pain and suffering: $30,000.00 for physical pain and suffering and $30,000 for mental pain and suffering. The jury further awarded Mr. Lyons only $50,000 for loss of enjoyment of life, for a total award of $110,000. The jury awarded Mr. Lyons nothing ($0) for permanent disability. These awards are abusively low, and shocking to our collective consciences, given the evidence presented at trial.[31]

Plaintiffs' evidence regarding Mr. Lyons's extreme physical pain and suffering was uncontroverted and totally supported by his treating physicians. His severe pain began around March 11, 2014, when he presented to Dr. DiPaolo, who performed the emergency debridement on his left hand that same day. His diary and all of his medical records show that he was never out of pain after that. On very few subsequent occasions, he had pain relief that put his pain at a 5 on a 10-point scale, according to his diary. The many doctors' appointments and treatments, which included changing the bandages/dressings, debridements, skin grafts, and special vacuum bandaging, were all sources of increasingly severe pain on top of his constant regular pain levels caused by the dying tissues.

The pain was very resistant to narcotic pain medication (which was consistent with Dr. Keldahl's testimony regarding the characteristics of radiation burns), which led Mr. Lyons to seek care from a pain management clinic. Mr. Lyons's diary reveals many occasions where he was unable to rest or sleep at

---

[31] The awards remain abusively low even taking into account that they would no longer be subject to reduction by Mr. Lyons's percentage of comparative fault, which has been eliminated.

night because of the severity of the pain. He developed an addiction to strong narcotic pain medication and had to seek professional help to break the addiction. His treating doctors were very concerned by his level of pain and were also concerned with the amount of narcotics he was using in order to obtain some relief. Mrs. Lyons's testimony corroborated her husband's pain levels. Mr. Lyons did not experience complete pain relief until after he recovered from the amputation surgery, which was performed in March of 2015, approximately a year after the first emergency debridement surgery.

Mr. Lyons also became depressed while dealing with his developing and increasingly severe injury. His diary reflects his despair at experiencing severe pain on a daily basis, as well as his addiction to the narcotic pain medication, and the anxiety caused, first by his doctors' initial inability to diagnose the cause of his injury, and later by their ultimate inability to halt the successive deep tissue death. His various doctors' records, as well as his wife's testimony, corroborates his mental pain and suffering during the year of his treatment before the amputation.

The evidence is also clear that the jury's award for loss of enjoyment of life is abusively low. Mr. Lyons and his wife both testified that in their retirement years, they planned to travel a lot, especially on golf trips, and were now unable to do so. Mr. Lyons also planned to enjoy working on his property, which has been curtailed. Both plaintiffs testified that they enjoyed cooking together, but Mr. Lyons was unable to participate in cooking in the ways that he used to, such as ingredient preparation, that required two functioning hands. It also bears mentioning that Mr. Lyons enjoyed his job as a consulting engineer. Prior to his endoleak surgery, he rarely missed a day at work, and planned to return to work after he recovered from the endoleak repair. He was unable to return to work on schedule, having to extend his sick leave and disability leave until it became

apparent that he would not be able to return to work. We recognize that Mr. Lyons did not make a claim for lost wages or loss of earning capacity, but nonetheless the evidence is clear that his job was something he enjoyed and which the injury ultimately forced him to give up earlier than he had planned.

Finally, the jury awarded Mr. Lyons nothing for permanent disability. This was manifestly erroneous both as a matter of law and as a matter of fact. The loss of a hand is a permanent disability. Given that the jury assessed fault to defendants, it was clear error for them to fail to make an award for this item, given the evidence in the record establishing Mr. Lyons's permanent disability. Without his hand, Mr. Lyons was unable to perform many acts of daily living without assistance. There is little doubt that Mr. Lyons's age rendered him less adaptable to its loss and to the mitigating effects that a prosthesis could provide. The record provides no justification for the jury's omission of an award for permanent disability, considering the particular circumstances of this case.

In *Head v. Pendleton Mem'l Methodist Hospital*, 95-0461 (La. App. 4 Cir. 1/31/96), 669 So.2d 504, 505, the plaintiff, an elderly woman who suffered burns to her hand during occupational therapy, was awarded $400,000 in general damages after her injuries required debridements, amputation of the tips of two fingers, and a skin graft. This plaintiff was unable to feel the burn due to preexisting conditions, and thus did not suffer with pain, but before the burn injury, she was ambulatory and could manage her personal hygiene. The injury and its complications left her severely depressed. The court of appeal, in 1996, affirmed this award despite defendants' arguments that it was excessive.

In *Williams v. Enriquez*, 41,200 (La. App. 2 Cir. 6/28/06), 935 So.2d 269, 274, the court of appeal affirmed a general damage award of $450,000 to the plaintiff in a medical malpractice case. After a delay in the proper diagnosis and treatment of his injury, the court of appeal considered that the plaintiff was

hospitalized for approximately 47 days, underwent 14 surgical procedures, including the amputation of his right index and middle fingers and reconstructive and plastic surgery, as well as a skin graft which involved the sewing of his hand to his abdomen for seven weeks. The court noted that the trial court specifically considered the numerous surgeries that the plaintiff endured; the attendant pain and suffering; the additional disfigurement of his hand; and the resulting mental and emotional anguish. The court also noted the testimony of family members as to substantial lifestyle changes the plaintiff had to make, as well as the constant pain he still was suffering more than 12 years post-accident.

In *Coleman v. Deno*, 99-2998 (La. App. 4 Cir. 11/6/02), 832 So.2d 1016, 1026, *writs denied*, 03-0166, 03-0167, and 03-0168 (La. 9/19/03), 853 So.2d 635, a 32-year-old plaintiff was awarded $4,000,000 in general damages in a medical malpractice action when a delay in treating an infection required the emergency amputation of his arm. In declining to lower the damage award on appeal, the appellate court recognized the plaintiff endured prolonged pain from the delayed treatment of his infection, as well as his arm amputation, that he lost his self-esteem with the loss of his arm, and that he was 32 years old at the time of the amputation, and found the general damage award not excessive for the particular injury and effect on the particular injured plaintiff under the circumstances.

Considering all of the evidence presented at trial, especially considering the particular circumstances of this particular plaintiff, Mr. Lyons, and after reviewing awards of similar injuries, we find that an appropriate *in globo* general damage award to Mr. Lyons is $750,000. This award takes into account the particular circumstances of Mr. Lyons, his age at the time of the injury, his abilities and activities before and disabilities since the amputation, and his life expectancy.

## DECREE

The judgment in favor of plaintiffs is amended as follows: the award for past medical expenses is amended to $704,218.68; the award for future medical expenses is increased from $0 (zero) to $395,775.00; the award of general damages to Mr. Lyons is increased from $110,000, *in globo*, to $750,000, *in globo*.[32] All appeal costs are assessed to defendants.

**JUDGMENT AMENDED AND AFFIRMED AS AMENDED**

---

[32] However, this award of *in globo* general damages may be subject to the $500,000 cap provided for in La. R.S. 40:1231.2(B)(1), which provides: "The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1231.3, shall not exceed five hundred thousand dollars plus interest and cost."

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES



FIFTH CIRCUIT
101 DERBIGNY STREET (70053)
POST OFFICE BOX 489
GRETNA, LOUISIANA 70054
www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **NOVEMBER 7, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

**23-CA-419**

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE NANCY A. MILLER (DISTRICT JUDGE)
WALTER C. MORRISON, IV (APPELLANT)     PETER J. WANEK (APPELLEE)

### MAILED
RACHEL M. NAQUIN (APPELLANT)
ATTORNEY AT LAW
1100 POYDRAS STREET
SUITE 2800
NEW ORLEANS, LA 70163

KATHRYN T. TREW (APPELLEE)
SHERYL D. STORY (APPELLEE)
ATTORNEYS AT LAW
1340 POYDRAS STREET
SUITE 2000
NEW ORLEANS, LA 70112

SAMANTHA S. BOUDREAUX (APPELLEE)
ATTORNEYS AT LAW
1340 POYDRAS STREET
SUITE 2000
NEW ORLEANS, LA 70124